**F I L E D**

PUBLISH

**July 21, 2005**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff - Appellee,<br><br>v.<br><br>GENE ALAN SUMMERS,<br><br>    Defendant - Appellant. | No. 04-2121 |

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff - Appellee,<br><br>v.<br><br>MARVIN THOMAS,<br><br>    Defendant - Appellant. | No. 04-2195 |

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CR-03-569 )**

Laura Fashing, Assistant U.S. Attorney, (and David C. Iglesias, United States Attorney, on the brief), Albuquerque, New Mexico, for Plaintiff - Appellee.

Dennis W. Montoya, Montoya Law, Inc., Rio Rancho, New Mexico, for Defendant - Appellant Gene Alan Summers.

Robert J. Gorence, Robert J. Gorence & Associates, P.C., Albuquerque, New Mexico, for Defendant - Appellant Marvin Thomas.

---

Before **SEYMOUR**, **KELLY**, and **TYMKOVICH**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

We have combined these separate appeals solely for the purpose of disposition.  Defendants-Appellants Gene Allan Summers and Marvin Thomas appeal their convictions for bank robbery and aiding and abetting, 18 U.S.C. §§ 2113(a) and 2, and conspiracy to commit bank robbery, 18 U.S.C. §§ 371 and 2113(a).  Individually, Mr. Summers argues that the evidence adduced at trial was insufficient to support his convictions and Mr. Thomas argues that the admission of testimonial hearsay violated his Sixth Amendment confrontation right under Crawford v. Washington, 541 U.S. 36 (2004).  Collectively, both argue that the alleged suppression of exculpatory evidence mandates reversal under Brady v. Maryland, 373 U.S. 83 (1963).   Our jurisdiction arises under 28 U.S.C. § 1291.  We reverse Mr. Summers convictions on the ground that insufficient evidence existed to support the jury's verdict.  We affirm Mr. Thomas's convictions.

Background

On February 27, 2003, Omar Mohammed and Curtis Dwayne Frazier robbed

a branch of the Bank of America in Albuquerque, New Mexico.[1]  After seizing $29,415.40 in cash and cash equivalents, Mohammed and Frazier escaped the scene in a gold Acura automobile.  A witness testified that the Acura began moving as Mohammed and Frazier entered the vehicle, thereby implying the existence of an unidentified accomplice.  IV R. at 160.  The automobile, which had been stolen four days prior to the bank robbery, was later found in the Vista Montano Apartments located a short distance from the bank.

The Vista Montano Apartments are adjacent to the Pinnacle View Apartments.  Shortly before the bank robbery, the Pinnacle View Apartments manager observed three individuals enter the apartment complex after parking the Acura outside the main gate.  Their activity aroused her suspicions, and she requested that the complex's maintenance workers "see where they were going, what apartment they were going to."  IV R. at 178.  The maintenance workers observed the individuals enter Apartment 2013 with a black bag.  Id. at 234.  Apartment 2013 was rented to Adrienne McCastle.  Id. at 181.  McCastle's boyfriend, Mr. Marvin Thomas, also stayed at the apartment though he was not a party to the lease.  Id. at 183.  Five to ten minutes later, maintenance workers observed the three individuals leave in the company of Mr. Thomas.  IV R. at

---

[1]On November 21, 2003, Mohammed and Frazier pleaded guilty to charges of bank robbery.  I Rec., Docs. 104, 106.

248-49; V R. at 32.  However, as demonstrated at trial the workers were unable to identify Mr. Summers as one of the individuals in the group.  IV R. at 258-59, 260; V R. at 32, 41.  The four individuals left the apartment complex in a red Ford Escape sport utility vehicle.  V R. at 32.  Mr. Thomas had rented the vehicle some three days earlier.  IV R. at 55.  Mr. Thomas returned after five or ten minutes, then left again a short time later.  V R. at 33.

During the pendency of these observations, a police officer investigating the theft of the Acura contacted the Pinnacle View Apartments manager.  IV R. at 203.  The manager informed the officer that she had seen a car matching the description of the stolen automobile, but by the time the officer arrived the vehicle had been moved.  Id. at 203-04.  Following the officer's departure, maintenance workers informed the apartment manager that the three individuals had returned to Apartment 2013.  Id. at 205.  The manager relayed the information to the police, and officers established a surveillance of the area.  Id.  Shortly thereafter, a maintenance worker and police officers observed four individuals exit Apartment 2013 and leave the complex in the red Ford Escape.  Id. at 250; V R. at 72, 119.  A police detective in an unmarked car followed the sport utility vehicle and was eventually joined by other unmarked units.  V R. at 79.  After a short pursuit, during which the aptly named Ford Escape exceeded the speed limit by some fifteen miles per hour, officers were successful in stopping the vehicle.

Id. at 122-24.

The officers conducted a felony stop, handcuffing and frisking the four occupants of the vehicle. Id. at 88. The occupants were identified as Mr. Summers, Mr. Thomas, Mohammed, and Frazier. A search of the vehicle revealed evidence linked to the bank robbery. Officers discovered $5,142.10 in cash in Mr. Thomas's pockets, including ten "bait bills" subsequently identified by the Bank of America. Id. at 219. Mr. Thomas also possessed a key to Apartment 2013. Id. at 250. Officers also discovered zippered bank bags containing significant quantities of cash or cash equivalents, clothing and latex gloves resembling those used in the robbery, a purple pillowcase containing cash and coins, and a large amount of cash in the cargo area. Id. at 216-18, 237-39, 255.

Although Messrs. Summers and Thomas were apparently silent during the stop and search, Mohammed cannot be described as reticent. When an officer asked Mohammed to identify suspicious items in his front pocket during a pat down, Mohammed replied: "What do you think? It's bank money." Id. at 130. Later, while being led to a police car, Mohammed inquired of an attending officer: "How did you guys find us so fast?" Id. at 144.

A subsequent search of Apartment 2013 revealed additional items connected to the robbery. Officers discovered keys to the stolen Acura and

clothing similar to that worn during the bank robbery. Id. at 212-13, 222-23. They also found vault blocks, coin wrappers, cash straps, and torn paperwork from the Bank of America. Id. at 228.

Messrs. Summers and Thomas, along with co-defendants Mohammed and Frazier, were subsequently indicted for bank robbery and aiding and abetting the same under 18 U.S.C. §§ 2113(a) and 2, and conspiracy to commit bank robbery in violation of 18 U.S.C. §§ 371 and 2113(a). On November 21, 2003, co-defendants Mohammed and Frazier pleaded guilty to bank robbery and aiding and abetting. Messrs. Summers and Thomas were subsequently tried and convicted on both counts of the indictment. Following his conviction, Mr. Summers filed a motion for judgment of acquittal on the basis that insufficient evidence existed to support his conviction. The district court denied the motion by written order. Mr. Summers subsequently filed a motion to vacate the guilty verdicts, arguing that the government had withheld exculpatory evidence. Mr. Thomas likewise filed a motion for a new trial, arguing that his Sixth Amendment confrontation right was violated by the admission of a testimonial hearsay statement and incorporating Mr. Summers' motion with respect to the exclusion of exculpatory evidence. The motions were denied.

<u>Discussion</u>

I.   <u>Sufficiency of the Evidence with Respect to Mr. Summers' Conviction</u>

Mr. Summers first argues that insufficient evidence existed to support his convictions.  We review de novo whether the government presented sufficient evidence to support a conviction.  <u>United States v. Dunmire</u>, 403 F.3d 722, 724 (10th Cir. 2005).  In so doing, we view the facts in evidence in the light most favorable to the government.  <u>Id.</u>  We will not weigh conflicting evidence or second-guess the fact-finding decisions of the jury.  <u>Van Nattan v. United States</u>, 357 F.2d 161, 162 (10th Cir. 1966).  Rather, our role is limited to determining "whether a reasonable jury could find guilt beyond a reasonable doubt, based on the direct and circumstantial evidence, together with the reasonable inferences to be drawn therefrom."  <u>United States v. Smith</u>, 133 F.3d 737, 741-42 (10th Cir. 1997).

Viewing the evidence in its entirety, a conviction must be grounded on more than a suspicion of guilt.  <u>United States v. Fox</u>, 902 F.2d 1508, 1513 (10th Cir. 1990).  We have repeatedly iterated that a conviction cannot be sustained if obtained by "'piling inference on inference.'"  <u>Dunmire</u>, 403 F.3d at 724 (quoting <u>United States v. Jones</u>, 44 F.3d 860, 865 (10th Cir. 1995).  While this rule is oft

- 7 -

cited,[2] it begs ready definition.

In the civil context, the import of the "inference upon inference" rule has largely been eroded.  See Salter v. Westra, 904 F.2d 1517, 1525 (11th Cir. 1990); Cora Pub, Inc. v. Cont'l Cas. Co., 619 F.2d 482, 485-86 (5th Cir. 1980); see also N.Y. Life Ins. Co. v. McNeely, 79 P.2d 948, 955 (Ariz. 1938) (setting forth a construction of the rule that has been adopted in numerous jurisdictions); 1A John

---

[2]The rule was apparently first expounded by the Supreme Court in United States v. Ross, 92 U.S. 281 (1875), a case originating in the Court of Claims and involving thirty-one bales of cotton captured by Union forces during the Civil War and claimed by their former owner under the Captured or Abandoned Property Act.  Commenting on the claimant's attempts to trace the bales from capture to sale, the Court noted:

> These seem to us to be nothing more than conjectures.  They are not legitimate inferences, even to establish a fact; much less are they presumptions of law.  They are *inferences from inferences*; *presumptions resting on the basis of another presumption*.  Such a mode of arriving at a conclusion of fact is generally, if not universally, inadmissible.

Id. (emphasis added).  Since that time, the rule has been cited in both civil and criminal cases.  The Supreme Court reiterated the rule in the criminal context in Direct Sales Co. v. United States, 319 U.S. 703, 711 (1943).  This court first applied the rule in the criminal context in Rosenberg v. United States, 120 F.2d 935, 937 (10th Cir. 1941).  See also Gallegos v. United States, 237 F.2d 694, 698 (10th Cir. 1956).  Numerous other courts, both federal and state, continue to invoke the rule.  See, e.g., United States v. Brodie, 403 F.3d 123, 134 (3d Cir. 2005); Brown & Root, Inc. v. N.L.R.B., 333 F.3d 628, 639 (5th Cir. 2003); United States v. Ramirez-Velasquez, 322 F.3d 868, 880 (5th Cir. 2003); Commonwealth v. Lao, 824 N.E.2d 821, 829 (Mass. 2005); State v. Dumars, 108 P.3d 448, 464 (Kan. Ct. App. 2005); State v. Miller, 103 P.3d 112, 115 (Or. Ct. App. 2004).

Henry Wigmore, Evidence in Trials at Common Law § 41 (Tillers rev. 1983)

(criticizing the rule in both contexts as "fallacious and impracticable"). In

criminal cases, however, its common-sense dictate continues to bear currency.

While some courts have rejected a mechanistic interpretation of the rule,[3] we find

its underpinnings to be sound, arising as they do from the requirement that the

government bears the burden to prove its case beyond a reasonable doubt. The

government may satisfy this burden, in whole or in part, through the use of

---

[3]See United States v. Bloom, 482 F.2d 1162, 1163-64 (8th Cir. 1973) (juxtaposing the "inference upon inference" rule against a sufficiency of the evidence inquiry and criticizing the former); United States v. Harris, 435 F.2d 74, 89 (D.C. Cir. 1970) (rejecting a literal interpretation of the rule); United States v. Ravich, 421 F.2d 1196, 1204 n.10 (2d Cir. 1970) (rejecting in the context of a challenge to the admission of evidence the "inference upon inference" rule, but noting that "[t]he length of the chain of inferences necessary to connect the evidence with the ultimate fact to be proved necessarily lessens the probative value of the evidence"); DeVore v. United States, 368 F.2d 396, 399 (9th Cir. 1966) (positing that the rule has been repudiated); Dirring v. United States, 328 F.2d 512, 515 (1st Cir. 1964) (stating that "[t]he rule is not that an inference, no matter how reasonable, is to be rejected if it, in turn, depends upon another reasonable inference; rather the question is merely whether the total evidence, including reasonable inferences, when put together is sufficient to warrant a jury to conclude that defendant is guilty beyond a reasonable doubt").

While preserving the "inference upon inference" rule in this circuit, we see little tension between our understanding of its import and that espoused in the cases noted above. Nor have our previous cases employed a formalistic approach to the operation of the rule. See Dunmire, 403 F.3d at 725-26 (discussing a string of impermissible inferences necessary to reach the jury's verdict); United States v. Sanders, 240 F.3d 1279, 1283 (10th Cir. 2001) (noting the dearth of evidence supporting multiple inferences from which the jury might have reached its conclusion); United States v. Leos-Quijada, 107 F.3d 786, 795 (10th Cir. 1997) (positing a string of impermissible inferences).

circumstantial evidence open to interpretation by the jury. Inferences are necessary and indeed proper in a criminal trial, and "a jury has wide latitude to determine factual issues and to draw reasonable inferences from circumstantial evidence." United States v. McCarrick, 294 F.3d 1286, 1293 (11th Cir. 2002). An inference is reasonable if it "flows from logical and probabilistic reasoning," i.e., with experience serving as the touchstone, a jury's inference is permissible where there is a reasonable probability that the conclusion flows from the facts in evidence.[4] Jones, 44 F.3d at 865. The rule that prohibits the stacking of inference upon inference merely indicates that at some point along a rational continuum, inferences may become so attenuated from underlying evidence as to cast doubt on the trier of fact's ultimate conclusion. In other words, "the chance of error or speculation increases in proportion to the width of the gap between underlying fact and ultimate conclusion where the gap is bridged by a succession of inferences, each based upon the preceding one." United States v. Shahane, 517 F.2d 1173, 1178 (8th Cir. 1975).

Like many courts that have addressed the issue, we do not foreclose the

---

[4]Under different circumstances, this court has stated that "[a] jury may draw an inference only where that inference can be made beyond a reasonable doubt." United States v. Rahseparian, 231 F.3d 1257, 1264 (10th Cir. 2000); United States v. Krohn, 573 F.2d 1382, 1389 (10th Cir. 1978). This is certainly true where the inference goes to an ultimate conclusion underpinning criminal liability, e.g., satisfying an element of a crime necessary for conviction.

possibility that a reasonable inference built on yet another reasonable inference may in some cases sustain a conviction. However, we believe the "inference upon inference" rule serves as an appropriate signpost, cautioning reviewing courts to measure the "gap" between fact and conclusion before acquiescing in the jury's leap.

In the context of the instant case, we have little difficulty in concluding that Mr. Summers' conviction runs afoul of the rule we reiterate today. At trial, the government advanced the theory that Mr. Summers acted as a getaway driver at the bank and was a member of an alleged conspiracy. To convict Mr. Summers on an aiding and abetting theory under 18 U.S.C. § 2, the government was required to demonstrate beyond a reasonable doubt that Mr. Summers (1) willfully associated with the charged criminal venture and (2) aided the venture through affirmative action. United States v. Delgado-Uribe, 363 F.3d 1077, 1084 (10th Cir. 2004). With respect to the charge of conspiracy, the government was required to prove (1) an agreement between two or more persons to break the law, (2) an overt act in furtherance of the conspiracy's objects, and (3) that the defendant willfully joined in the conspiracy. United States v. Shepard, 396 F.3d 1116, 1123 (10th Cir. 2005).

Turning to the aiding and abetting charge, to convict on the government's theory the jury must have first inferred that because Mr. Summers was an

occupant of the red Ford Escape at the time of his arrest, he also accompanied Mohammed and Frazier to the Pinnacle View Apartments. This despite the fact that witnesses who testified to the arrival and departure of the three individuals at the Pinnacle View apartments could not positively identify Mr. Summers. IV R. at 258; V R. at 41. The jury then must have inferred that Mr. Summers previously accompanied Mohammed and Frazier to the Bank of America branch, again despite the fact that no witness could place Mr. Summers or recall seeing him at the bank. IV R. at 95, 107-08, 140, 155. Finally, the jury must have inferred that Mr. Summers was a third occupant of the gold Acura and facilitated the bank robbers' getaway, again despite the fact that the witness who testified that the Acura was moving when the driver entered the vehicle was unable to identify or testify to the presence of a third occupant. Id. at 169, 171, 173. Moreover, no fingerprints or evidence were found in the Acura belonging to Mr. Summers.

The first inference was arguably reasonable given the fact that police officers and a maintenance worker observed four individuals leave apartment 2013, enter the red Ford Escape, and subsequently leave the apartment complex prior to pursuit and capture. Id. at 250; V R. at 72, 119. Of course, at the conclusion of the pursuit, Mr. Summers' was taken into custody. However, even if the first inference was reasonable, the "gap" between the evidence admitted in the case and the jury's ultimate conclusion appears to us far too wide to uphold

Mr. Summers' conviction. The defendant's mere presence with the perpetrators of the substantive crime is insufficient to support a conviction under an aiding and abetting theory. Delgado-Uribe, 363 F.3d at 1084; United States v. Anderson, 189 F.3d 1201, 1207 n.3 (10th Cir. 1999). Investigators were unable to find fingerprints or any other evidence in the Acura linked to Mr. Summers. V R. at 25. Absent any evidence tying Mr. Summers to the gold Acura or establishing his presence with the bank robbers outside the apartment complex, the probability that Mr. Summers acted as a getaway driver does not appear reasonable.

Similarly, we are not persuaded that sufficient evidence exists to uphold Mr. Summers' conspiracy conviction. Assuming the existence of both an agreement between his co-defendants and overt acts in furtherance of a conspiracy, there is insufficient evidence to adduce that Mr. Summers willfully joined or participated in the conspiracy. Although the jury might have inferred Mr. Summers' presence in Apartment 2013 prior to the departure of the red Ford Escape, there was simply no evidence to link Mr. Summers' to the sorting of cash or other post-robbery activities therein. Mere presence in the apartment or association with co-defendants is insufficient to support a conspiracy conviction. United States v. Starnes, 109 F.3d 648, 650 (10th Cir. 1997); United States v. Espinosa, 771 F.2d 1382, 1392 (10th Cir. 1985). There was no evidence establishing communication between Mr. Summers and his co-defendants prior to

February 27.  V R. at 25.  Unlike his co-defendant Mr. Thomas, officers failed to discover any evidence linked to the bank robbery on Mr. Summers' person.  Id. at 23-24.  While evidence connected with the robbery was found *near* Mr. Summers, his proximity to the various funds and other items in the red Ford Escape, even coupled with his presence in Apartment 2013 prior to detention, is simply insufficient to permit a reasonable inference of his willful participation in the conspiracy absent some other showing.[5]

Finally, having carefully considered the district court's order denying Mr. Summers' post-conviction motion for judgment of acquittal, we find its consideration of the evidence adduced at trial unpersuasive.  The district court apparently believed that witness testimony affirmatively established Mr.

---

[5]We discuss below the district court's error in admitting Mohammed's inculpatory statement, "How did you guys find us so fast?," at trial.  Although Mr. Summers' joined in Mr. Thomas's objection to the admission of the statement before the district court, he has not raised the argument on appeal.  Thus, the issue is deemed waived.  United States v. Wiseman, 297 F.3d 975, 979 (10th Cir. 2002).  Of course, we may notice error to prevent manifest injustice.  United States v. Santistevan, 39 F.3d 250, 256 (10th Cir. 1994).  We need not so intervene here.  To the extent that the jury might have considered Mohammed's statement in reaching its verdict with respect to Mr. Summers, its admission does not alter our conclusion regarding the sufficiency of the evidence supporting Mr. Summers' conviction.  Given the paucity of evidence linking Mr. Summers to the charged offenses, we find that the admission of Mohammed's statement could not have alone, or collectively with the other evidence adduced at trial, supported Mr. Summers' conviction.  Although the statement was inculpatory and prejudicial, its true impact must be gauged in reference to additional evidence presented to the jury.  In Mr. Summers' case, the evidence linking him to the crime was so tenuous as to render deliberative reliance on Mohammed's statement untenable.

Summers' entry into Apartment 2013 with Mohammed and Frazier. However, as noted above, the Pinnacle View Apartments' maintenance workers could not identify Mr. Summers as one of the individuals entering the apartment. The district court also relied on evidence regarding suspicious behavior observed by police, the proximity of evidence linked to the bank robbery to the seat occupied by Mr. Summers in the red Ford Escape, and his presence in the vehicle during the subsequent pursuit. Even taken collectively, this evidence remains insufficient to support Mr. Summers conviction. While the defendant's reactions to police observation may provide some evidence, such reactions are far from conclusive. Beyond general proximity, no evidence was adduced linking Mr. Summers' to the items found near his seat in the red Ford Escape. While it is true that the jury may take into consideration a defendant's *intentional* flight following the commission of a crime in determining guilt or innocence, we have likewise noted that "evidence of mere association or presence, *even when coupled with evidence of flight*, is not enough to support a conspiracy conviction." Espinosa, 771 F.2d at 1393 (emphasis added). Such is the case here. We therefore conclude that Mr. Summers' conviction was not supported by sufficient evidence and should be reversed.

II.     Hearsay Issues

Mr. Thomas first complains that the admission of a hearsay statement by

- 15 -

co-defendant Mohammed violated his Sixth Amendment confrontation right.[6]  As
noted above, over defense objection[7] the district court permitted the following
colloquy between the prosecution and Officer Daniel Wolf of the Albuquerque
Police Department describing events immediately following the stop of the red
Ford Escape:

> Q.   Now, just before lunch, we were talking about your having
>       patted down Mr. Omar Mohammed.  Do you recall that?
>
> A.   Yes, sir.
>
> Q.   And explain what happened when you patted him down.
>
> A.   Well, again, I patted him down, and I felt hard items that were

---

[6]The Sixth Amendment to the Constitution provides, in relevant part, that
"[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be
confronted with the witnesses against him."  U.S. Const. amend. VI.

[7]At several points during argument stemming from the objection, defense
counsel emphasized his inability to cross-examine Mohammed regarding his
statement.  V R. at 133, 139.  However, much of the discussion at trial centered
on exceptions to the hearsay rule and whether Mohammed's statement was indeed
hearsay.  Ordinarily, we will only review for plain error an issue that was not
raised with specificity before the district court.  See United States v. Allen, 129
F.3d 1159, 1162 (10th Cir. 1997).  However, in repeatedly emphasizing his
inability to cross-examine Mohammed we find that Mr. Thomas effectively
preserved the Confrontation Clause error for review.  See Ohio v. Roberts, 448
U.S. 56, 62-64 (1980) (discussing the interplay between the hearsay rule and the
Confrontation Clause), *overruled on other grounds by* Crawford, 541 U.S. at 37.
    Following his conviction, Mr. Thomas filed a motion for new trial under
Fed. R. Crim. P. 33(b)(2) on the ground that the admission of testimonial hearsay
violated his Sixth Amendment confrontation right.  The district court denied the
motion as untimely.  I R. (Thomas) at Doc. 242.  Mr. Thomas does not appeal the
denial of the motion.  However, because Mr. Thomas objected at trial, the issue is
properly before this court.

cylinder-like in shape. And it felt immediately like it could be a weapon, and my thought process was possibly a handgun, a revolver. And I asked him, "What is this?" while patting on the outside of his pants pocket. And he said, "What do you think it is? It's bank money."

Q.     And did you then take – Did you take the coins from him, or did you –

A.     No, sir. I left them in his pocket, along with all his other belongings, and I began walking him over to a patrol car that had arrived.

Q.     And as you walked him over to the patrol car, did he say anything?

A.     Yes, sir, he did.

Q.     And tell the ladies and gentlemen of the jury what he said.

A.     He stated, "*How did you guys find us so fast*?"

V R. at 144 (emphasis added).

At trial, Mr. Thomas's counsel clearly argued that the question, "How did you guys find us so fast?," was hearsay and that its admission would violate Mr. Thomas's right to cross-examine or confront the declarant. Id. at 133. The government argued that Mohammed's question could not qualify as a statement or assertion, and thus was not hearsay, or, in the alternative, that admission of the statement was permissible under the present sense impression exception to the hearsay rule or as a statement against interest. Id. at 140; see also Fed. R. Evid. 803(1) & 804(b)(3). In overruling the objection, the district court posited: "I

- 17 -

think it's – I'm not sure – I'm not convinced it's hearsay.  And even if it is, I think it comes under the exception for present-sense exception." Id. at 142.

While a district court's decisions regarding the admission of evidence are reviewed for abuse of discretion, this court reviews de novo the legal question of whether the admission of a non-testifying co-defendant's statement at trial violates the accused's Sixth Amendment confrontation right.  United States v. Verduzco-Martinez, 186 F.3d 1208, 1212 (10th Cir. 1999).  In so doing, we must apply the rule set forth in Crawford v. Washington, 541 U.S. 36 (2004).[8]  In Crawford the Supreme Court held that the admission of testimonial hearsay at trial, absent the unavailability of the declarant and a prior opportunity for cross-examination by the defendant, violates the accused's confrontation right under the Sixth Amendment.  Id. at 68.  Applied to the facts of this case, Crawford necessitates the following multi-part inquiry.

A.    Whether Mohammed's Question, "How Did You Guys Find Us So Fast?,"
       Was Hearsay

In addressing Mr. Thomas's argument, we must first ascertain whether the question, "How did you guys find us so fast?," is properly considered hearsay.  It

_____

[8]Crawford was decided on March 8, 2004, not long after the conclusion of Messrs. Summers' and Thomas's trial.  Nevertheless, the Crawford rule applies to the instant case because it is on direct review.  Griffith v. Kentucky, 479 U.S. 314, 328 (1987); United States v. Solomon, 399 F.3d 1231, 1237 n.2 (10th Cir. 2005).

hardly needs stating that the admission of hearsay is frowned upon and generally inadmissible at trial. Fed. R. Evid. 802. Under the Federal Rules of Evidence, hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). A statement "is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Id. 801(a). The term "assertion" is not defined in Rule 801. "Assert" is generally defined as "to state or declare positively and often forcefully or aggressively" or "to demonstrate the existence of." Webster's Ninth New Collegiate Dictionary 109 (1991). To further guide our inquiry, the advisory notes to Rule 801 indicate that "[t]he key to the definition [of a statement] is that nothing is an assertion unless intended to be one." The government limits its argument on appeal to the contention that Mohammed's declaration is not hearsay because the declarant did not intend to make an assertion by uttering the words. We disagree.

In United States v. Jackson, 88 F.3d 845 (10th Cir. 1996), we addressed for the first time whether the admission into evidence of a question posited by a non-testifying witness constituted hearsay within the meaning of Rules 801(c) and 802. In that case, officers recovered the pager of a suspected carjacker during a foot pursuit. Id. at 846. While an officer filled out a report on the carjacking, the pager went off and displayed a telephone number. Id. The officer called the

displayed number and heard a voice say, "Is this Kenny?" The question was admitted over objection through the testimony of the officer, and the defendant was convicted of carjacking and related firearm offenses. Id. As in this case, the government argued that there was no error in the admission of the declaration because, as a question lacking assertive quality, it did not constitute hearsay under Rule 801(a)(1) and (c). Id. at 847. In determining that the question, "Is this Kenny?," did not constitute hearsay, we emphasized that such a declaration could not "reasonably be construed to be an assertion, either express or implied." Id. at 848. We explained that in analyzing the question, we found "it hard to believe in this case that the declarant *intended* to assert that Mr. Jackson was in possession of the pager and that he was responding to her call." Id. (emphasis added). We did not, however, foreclose the possibility that a question might indeed be construed as an assertion, either express or implied.

Our decision in Jackson relied in part on the District of Columbia Circuit's decision in United States v. Long, 905 F.2d 1572 (D.C. Cir. 1990). In Long, the defendant was charged with various firearms and narcotics charges after a police search of the apartment in which Keith Long was arrested revealed a plethora of evidence related to the charged criminal conduct. Id. at 1575. While officers were searching the apartment, a telephone rang and police answered it. Id. at 1579. The unidentified caller first asked to speak with "Keith" and then inquired

whether Keith "still had any stuff." Id. When queried as to the meaning of this question, the caller responded by indicating a quantity of crack cocaine. Id. Over defense objection, the police officer was permitted to testify concerning the conversation at trial. Id. Long argued that the caller's questions contained implicit assertions of his involvement in narcotics distribution and that the government introduced the statements to prove the truth of those assertions. Id. Writing for the court, then Circuit Judge Clarence Thomas rejected Long's argument. Noting that "[i]t is difficult to imagine any question, or for that matter any act, that does not in some way convey an implicit message," the court focused squarely on the intent of the caller. Id. at 1580. The court found that Long had failed to provide any evidence to suggest that the unidentified caller actually intended to assert that he was involved in narcotics distribution. Id.

Taken together, Jackson and Long do not foreclose the possibility that a declaration in the form of a question may nevertheless constitute an assertion within the meaning of Rule 801(a) and (c). Rather, both cases properly focus the inquiry on the declarant's intent. Furthermore, it is the party challenging admission of the declaration that bears the burden of demonstrating the declarant's requisite intent. Jackson, 88 F.3d at 848; Long, 905 F.2d at 1580; Rule 801 advisory committee's note ("The rule is so worded as to place the burden upon the party claiming that the intention existed; ambiguous and doubtful

- 21 -

cases will be resolved against him and in favor admissibility.").

Turning to the facts of the instant case, we hold that Mr. Thomas has met his burden of demonstrating that by positing the question, "How did you guys find us so fast?," Mohammed intended to make an assertion. Unlike the rather innocuous and ambiguous question in Jackson, Mohammed's question clearly contained an inculpatory assertion. It begs credulity to assume that in positing the question Mohammed was exclusively interested in modern methods of law enforcement, including surveillance, communication, and coordination. Rather, fairly construed the statement intimated both guilt and wonderment at the ability of the police to apprehend the perpetrators of the crime so quickly. This in turn is distinguished from the questions in Long that were designed to elicit information and a response, rather than assert the defendant's involvement in criminal activity. Thus, on the face of the record, we hold that Mohammed's intent to make an assertion was apparent and that his question directed to police officers on the scene constituted hearsay for purposes of Rule 802.

B.     Whether Mohammed's Statement was Testimonial

Having determined that Mohammed's statement was hearsay, we must next ascertain whether it was testimonial. As the Supreme Court has explained, only testimonial hearsay is subject to Crawford's rule. Crawford, 541 U.S. at 68. However, in propounding the rule in Crawford, the Supreme Court declined to

- 22 -

rigidly define what is meant by the term "testimonial." Id. ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'"). Thus, we are left to go where angels and even Justices fear to tread. See Noble v. White, 996 F.2d 797, 800 (5th Cir. 1993) ("If there are areas where angels fear to tread, surely there are places the sight of which make federal judges tremble.")

The Crawford opinion is not, however, devoid of guidance for appellate courts considering whether hearsay in a given case is testimonial. To the contrary, the opinion provides relevant guideposts to frame our analysis. In Crawford, the defendant was convicted of assault after stabbing a man who allegedly tried to rape his wife. Crawford, 541 U.S. at 38. At trial, the state played a tape-recorded statement of the defendant's wife describing the stabbing to police officers. Id. at 39-40. Her statement arguably differed from the defendant's own account. Id. at 39. The defendant's wife did not testify at trial because of Washington's marital privilege. Id. at 40. However, over objection, the district court admitted the tape recording of her prior statement as a statement against penal interest. Id.

The Court first turned to the historical background of the Sixth Amendment to help determine the breadth of the confrontation right. Id. at 42-51. In the Court's view, "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte*

examinations as evidence against the accused." Id. at 50. Under the civil law, testimony adduced through private examination of witnesses by judicial officers might be used against the defendant at trial without the opportunity for cross-examination. See id. at 43. Such practices had at times found their way into common-law practice, though not without considerable protest. See id. at 43-45, 48. It is with this historical practice in mind, whereby formal statements made to government officers might be admitted against the accused, that the Sixth Amendment must be interpreted. Id. at 50. As the Court further explained, the text of the Sixth Amendment reflects the founder's especial concern regarding formal, ex parte communications, applying as it does to "witnesses," or those who give testimony, against the accused. Id. at 51. In other words, "even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object." Id. at 53.

Drawing on this historical analysis and the factual circumstances of the case, the Court established a baseline or minimum with respect to the question of what constitutes testimonial hearsay. In the words of the Court, "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a formal trial; and to police interrogations." Id. at 68. In that the statement at issue in Crawford was made to police officers during interrogation, the Court had little difficulty in concluding that it was

testimonial in nature.

But what lies beyond the minimum?  The Court gave some hint in commenting on other formulations of the "core class of 'testimonial' statements." Id. at 51.  For instance, Crawford himself urged a definition that would include "'*ex parte* in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially.'" Id. (quoting Brief for Petitioner at 23). Justice Scalia, writing for the Court, also took note of a formulation previously propounded by concurring Justices that would have included "'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.'" Id. at 51-52 (quoting White v. Illinois, 502 U.S. 346, 365 (1992) (Thomas, J., joined by Scalia, J., concurring in part and concurring in the judgment)).  Finally, *amici curiae* urged that testimonial statements included those "'that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'"  Id. at 52 (quoting Brief for National Association of Criminal Defense Lawyers et al. as *Amici Curiae* at 3).  Without endorsing a particular formulation, the Court indicated that all shared a "common nucleus." Id.

We conclude that the "common nucleus" present in the formulations which the Court considered centers on the reasonable expectations of the declarant. It is the reasonable expectation that a statement may be later used at trial that distinguishes the flippant remark, proffered to a casual acquaintance, see id. at 51, from the true testimonial statement. Certain factual circumstances surrounding an out-of-court statement give rise to just such an expectation, including formalized settings such as police interrogations, confessions, or the taking of statements under oath. We need not at this juncture define with any certainty the possible universe of circumstances that would lead an objective declarant to believe that his statement might subsequently be used in a criminal investigation or prosecution. We further reject a narrow approach that would limit testimonial statements to those made by witnesses "who testify either by taking the stand in person or via government-prepared affidavits, depositions, videotapes, and the like." Ahkil Reed Amar, Confrontation Clause First Principles: A Reply to Professor Friedman, 86 Geo. L.J. 1045, 1045 (1998). Such an approach is akin to that expressly rejected by the Court in Crawford, 541 U.S. at 50 (rejecting "the view that the Confrontation Clause applies of its own force only to in-court testimony"), in that it emphasizes form over substance. Rather, we believe an objective test focusing on the reasonable expectations of the declarant under the circumstances of the case more adequately safeguards the accused's confrontation

right and more closely reflects the concerns underpinning the Sixth Amendment. See Richard D. Friedman, Confrontation: The Search for Basic Principles, 86 Geo. L. J. 1011, 1040-43 (1998). Thus we hold that a statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that his statement might be used in the investigation or prosecution of a crime.[9]

Turning to the circumstances of this case, we hold that Mohammed's hearsay statement, "How did you guys find us so fast?," was testimonial in nature and that its admission at trial violated the rule in Crawford.[10] Although Mohammed had not been read his Miranda rights and was not subject to formal interrogation, he had nevertheless been taken into physical custody by police officers. His question was directed at a law enforcement official. Moreover,

---

[9]In a carefully reasoned decision, the Sixth Circuit enunciated a similar standard in United States v. Cromer, 389 F.3d 662, 675 (6th Cir. 2004) (involving the statement of an informant and promulgating the following standard: "The proper inquiry, then, is whether the declarant intends to bear testimony against the accused. That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime."). See also United States v. Hendricks, 395 F.3d 173, 181 (3d Cir. 2005) (determining that intercepted statements between defendants and other third parties were not testimonial as the declarants did not make the statements in the belief that they might be used at a later trial); United States v. Saget, 377 F.3d 223, 228 (2d Cir. 2004) (noting that "Crawford at least suggests that the determinative factor in determining whether a declarant bears testimony is the declarant's awareness or expectation that his or her statements may later be used at trial").

[10]The government has not disputed the fact that the statement was used to prove the truth of the matter asserted, i.e., the guilt of the co-defendants. Therefore, we do not address this issue.

Mohammed's statement not only implicated Mr. Thomas, it also implicated himself and was thus loosely akin to a confession. Under these circumstances, we find that a reasonable person in Mohammed's position would objectively foresee that an inculpatory statement implicating himself and others might be used in a subsequent investigation or prosecution.

Our conclusion that Mohammed's statement constituted testimonial hearsay forecloses reliance on the present sense impression exception to the hearsay rule. In abrogating its previous decision in Roberts, permitting the use of statements in criminal trials where admission was firmly rooted in a hearsay exception, the Crawford Court made clear that "[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence." 541 U.S. at 61. Under this clear command, we conclude that the district court abused its discretion in admitting Mohammed's statement at trial.

C. Harmless Error

Even though we have determined that the admission of Mohammed's statement violated the rule in Crawford, Confrontation Clause violations are nevertheless subject to harmless error analysis. Brown v. Uphoff, 381 F.3d 1219, 1226 (10th Cir. 2004); see also Crawford, 541 U.S. at 42 n.1 (noting that the state had not challenged a previous appellate conclusion that the error was not

harmless); United States v. Pugh, 405 F.3d 390, 400-01 (6th Cir. 2005) (subjecting a Crawford violation to harmless error analysis). Under a harmless error analysis, the government bears the burden of demonstrating that the error was harmless beyond a reasonable doubt. United States v. Lott, 310 F.3d 1231, 1250 (10th Cir. 2002); United States v. Toles, 297 F.3d 959, 968 (10th Cir. 2002). This court does not review the error in isolation. Instead, we review the record de novo to determine the probable effect of the erroneous admission. United States v. Glass, 128 F.3d 1398, 1403 (10th Cir. 1997). "[O]ur judgment is informed by the context in which the statement was admitted, how it was used at trial, and how it compares to the properly admitted evidence." Id.; see also Toles, 297 F.3d at 968 ("Among the factors to consider are the importance of the witness' [sic] testimony in the prosecution's case, the cumulative nature of the testimony, the presence or absence of corroborating or contradictory testimony, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case.").

Having carefully reviewed the record, we hold that the Crawford violation in Mr. Thomas's case was harmless beyond a reasonable doubt. The jury was presented ample evidence of Mr. Thomas's guilt on which to base its verdict. Funds linked to the bank robbery were discovered on Mr. Thomas's person. It is undisputed that he rented the red Ford Escape and was the driver of the vehicle

during a police pursuit following the robbery. Evidence related to the bank robbery was discovered in the apartment in which Mr. Thomas lived with his girlfriend, and several witnesses placed him in the company of his co-defendants at the apartment.

After examining the use of the offending statement at trial, we are further persuaded that its admission was harmless. The statement was first admitted through the testimony of Officer Wolf during a lengthy direct examination concerning the officer's first-hand observations of the pursuit and arrest of the co-defendants. The government returned to the statement only once at trial, and that during its rebuttal argument at closing. The government's exceptional emphasis of an offending hearsay statement during closing argument might in some cases tip the balance in a harmless error review. This is especially true during a rebuttal argument that will not be subject to comment by the defense. The underlying concern is that in emphasizing an inculpatory hearsay statement, the government might relieve the jury of its duty to find a defendant guilty beyond a reasonable doubt. However, we find this is not the case here. Reference to Mohammed's statement constituted more of a digression than a calculated attack. In rebutting the defense's contention that the co-defendants did not communicate prior to the day of the robbery, thus attempting to cast doubt on Messrs. Summers' and Thomas's involvement, the government directed the jury's

attention to the testimony of a witness to the bank robbery. We quote the

argument here to demonstrate the context in which reference to Mohammed's

statement was made.

> And let me read something that I had typed up so that I would
> get it right. This is a transcript of Diane DeBuck's testimony. And
> something struck me. And I don't know, maybe you-all made a note
> of this, but I want to read it to you because there's been a lot of – lot
> to do about, well, they didn't communicate and they didn't talk.
> Well, I suggest to you, ladies and gentlemen, they did talk, and they
> talked sooner than February the 27th, and this was a plan, and it was
> a planned bank robbery planned by someone smarter than Omar
> [Mohammed], who ended up with the nickles [sic] in his pocket.
>
> I presume that these two [referring to Messrs. Summers and
> Thomas], we know, aren't the thugs that went in the bank and took it
> over. They stayed back. And that's why they're surprised, and that's
> why they're like dear [sic] in the headlights, when they're caught.
> *And as Omar says, "How did you guys find us so fast?"*
>
> But let me get back to Diane, and I'll end with this. . . .

VII R. at 153 (emphasis added). The context makes clear that the government did

not place undue emphasis on the statement during its rebuttal argument. We do

not find this the type of argument or reference that would relieve the jury of its

proper function, affording but one choice, and that to convict. Given the strength

of the government's case against Mr. Thomas, we conclude that the admission of

Mohammed's statement was harmless beyond a reasonable doubt.

III.    Suppression of Exculpatory Evidence

Both Messrs. Summers and Thomas argue that the government's alleged

- 31 -

suppression of exculpatory evidence in violation of the Supreme Court's decision in Brady, 373 U.S. at 87, mandates reversal. Because we have concluded there was insufficient evidence to support Mr. Summers' conviction, we need not reach his arguments respecting the Brady violation. However, we do consider Mr. Thomas's arguments in this regard.

Under Brady, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. In fact, the prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request. Scott v. Mullin, 303 F.3d 1222, 1228 n.2 (10th Cir. 2002) (citing United States v. Agurs, 427 U.S. 97, 107 (1976)).

Mr. Thomas points to the affidavit of one Lyle Campbell as exculpatory evidence suppressed by the government in violation of Brady. See I R., Doc. 209, at Ex. A. In his affidavit, dated March 8, 2004, some sixteen days after the jury returned a verdict against the defendants, Campbell asserts that he witnessed two individuals enter the Bank of America branch on February 27, 2003. Id. at 1. The individuals aroused his suspicions. Id. After identifying the gold Acura as similar to one he observed at the bank, Campbell asserted that he was able to see into the car at the time and that there was no one inside the vehicle. Id. at 2.

According to the affidavit, Campbell phoned the police at the time and filled out a witness statement form.  Id. at 2, 4.  Campbell also indicated that he had relayed the information later recounted in his affidavit to the government's prosecutor immediately prior to Messrs. Summers' and Thomas's trial.  Id. at 4.  Having relayed to the prosecutor that there was no third person in the gold Acura, Campbell iterated forcefully that the government "was wasting my time and the taxpayer's money, because there was no other person driving [the gold Acura]."  Id. at 4-5.  Although Campbell's name appeared on the government's witness list, he was not called at trial and no summary or other recording of his purported assertions was presented to the defense.

On March 18, 2004, Mr. Summers filed a motion to vacate his conviction on the basis of the alleged suppression of exculpatory evidence.  I R. at Doc. 209.  After a hearing that included the testimony of Campbell, the motion was denied on May 10, 2004.  Mr. Thomas's attorney did not appear or argue at the hearing.  However, on May 11, 2004, Mr. Thomas filed a motion for new trial, purportedly joining Mr. Summers' March 18 motion.  In denying Mr. Thomas's motion, the district court provided two alternative grounds.  First, the court found that the motion was untimely in that it purported to join and incorporate an argument by reference in a motion that had already been heard and decided.  I R., Doc. 240 at 19-20.  Alternatively, the district court denied the motion on the merits, finding in

- 33 -

relevant part that Campbell's testimony and affidavit were not exculpatory as to

Mr. Thomas.  Id. at 21.

We generally review a district court's denial of a motion for new trial for

abuse of discretion.  United States v. Sinclair, 109 F.3d 1527, 1531 (10th Cir.

1997).  However, where a motion for new trial is based on an allegation that the

government suppressed exculpatory evidence in violation of Brady, we review the

district court's decision de novo.[11]  United States v. Lopez, 372 F.3d 1207, 1210

(10th Cir. 2004); United States v. Combs, 267 F.3d 1167, 1172 (10th Cir. 2001).

To establish a Brady violation, Mr. Thomas must show that "(1) the prosecution

suppressed evidence; (2) the evidence was favorable to the accused; and (3) the

---

[11]Both parties to this appeal assumed that we would review the district court's denial of the motion for new trial under the abuse of discretion standard set forth in Sinclair, 109 F.3d at 1531.  There we noted that when a defendant brings a motion for new trial on the basis of newly discovered evidence, he is generally required to show:

> (1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

Id.  However, our precedent makes clear that when the newly discovered evidence implicates a Brady violation claim, we apply the de novo standard of review set forth above.  See, e.g., Lopez, 372 F.3d at 1209-10.  In any event, our holding would be the same under either standard.

evidence was material to the defense." Lopez, 372 F.3d at 1210 (internal citations and quotations omitted). "[W]e will reverse the district court only if the suppression of evidence denied the defendant a fair trial." Id.

We decline the opportunity to break new ground and decide the issue before us on the basis of the district court's first alternative holding. Rather, as the district court did, we choose to address the merits of Mr. Thomas's argument. It is clear from our review of the record that Mr. Thomas is unable to demonstrate a reversible Brady error. Even assuming that the government suppressed the evidence in question, Mr. Thomas cannot show that the evidence was favorable to his defense. As noted above, the prosecution's theory advanced at trial was that Mr. Summers, not Mr. Thomas, was the unidentified third occupant of the gold Acura at the time of the bank robbery. The evidence supporting Mr. Thomas's conviction centered instead on the items found on his person and in the apartment he shared with his girlfriend, his role in the pursuit leading to his arrest, and his association with the co-defendants. None of this evidence is at all affected by Campbell's observations. Accordingly, we hold that the district court did not err in denying Mr. Thomas's motion for new trial.

For the aforementioned reasons, we REVERSE Mr. Summers' conviction as unsupported by sufficient evidence. We AFFIRM Mr. Thomas's conviction and the denial of his motion for new trial.