In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3848

A.I. Credit Corporation,

Plaintiff-Appellant,

v.

Legion Insurance Co., et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 99 C 10--Allen Sharp, Judge.

Argued April 17, 2001--Decided September 12, 2001


   Before Fairchild, Cudahy, and Coffey,
Circuit Judges.

   Fairchild, Circuit Judge.  A.I. Credit
Corporation is a premium finance company
that lends its clients money to pay
commercial insurance premiums. When one
of its clients, Monon Corporation, was
placed into involuntary bankruptcy
without repaying more than $2 million in
insurance financing debts, A.I. Credit
brought this fraud suit alleging
primarily that the individuals who
negotiated two Monon loans in 1996
conspired to defraud A.I. Credit by
misrepresenting the status of the
collateral and the intended use of the
loan proceeds./1 The district court
entered summary judgment against two of
the defendants (Monon's insurance broker,
Peterson, and his wholly-owned
corporation) after they failed to respond
to A.I. Credit's motion, but granted
summary judgment in favor of Monon's
chief financial officer, Franklin, as
well as its insurers' representative, Mc
Pherson, and two insurance companies and
a marketing company with which McPherson
is affiliated. A.I. Credit appeals from
the judgment for these defendants.
Because we conclude that genuine issues
of material fact exist, we vacate and
remand.

I.

We recount the evidence before the court in the light most favorable to A.I. Credit, the non-moving party. A.I. Credit had financed Monon's workers' compensation insurance premiums in 1994 and 1995. Although the financed policies were underwritten by Legion Insurance Company and Mutual Indemnity, Ltd., the policy information necessary to make the loans was obtained by A.I. Credit from William McPherson, a producer at Commonwealth Risk Services, Inc. (Commonwealth is the marketing branch of the parent company of Legion and Mutual; we'll refer to all three companies as "the insurers.") McPherson was responsible for generating business for Legion and Mutual and was compensated accordingly; Monon was among his five most profitable accounts.

In 1996, unknown to A.I. Credit, Monon financed its workers' compensation insurance through a different company-- Anthem Premium Finance. Monon's chief financial officer, John Franklin, entered a loan agreement with Anthem in March 1996. The agreement granted Anthem a security interest in any "return premiums" arising out of the policy-- refunds payable to Monon from the claims reserve fund in which its premium payments were deposited in the event its actual losses were lower than projected. April 1 letters from Monon's Franklin and the insurers' McPherson confirmed Anthem's security interest in the "available cash" in this fund.

According to Monon's controller, Miles Holsworth, Monon was in serious financial trouble around this time: a "huge order" from a single customer, Consolidated Freightways, Inc. (CFI), was "keeping th[e] company alive." Monon owed money to CFI, and CFI threatened to cancel its order if Monon failed to pay promptly. (Holsworth Dep. at 146-47.) According to A.I. Credit's theory, Monon, desperate for cash, arranged a conference call to negotiate another loan from A.I. Credit under the pretense of financing the workers' compensation premiums that Anthem already had financed. Holsworth testified in his deposition that he, along with Monon's Franklin, the insurers' McPherson, and Monon's insurance broker, Michael Peterson, participated in one or more conference calls with an A.I. Credit representative

sometime in April 1996. Id. at 46-49, 133-36, 150, 225-29, 244-45, 292-93. According to Holsworth, when the A.I. Credit representative expressed concern regarding collateral, Franklin "offered up the Mutual Indemnity workers' comp. balance"--the same funds already pledged to Anthem. Holsworth further testified that, during the call, Peterson, the broker, confirmed to the A.I. Credit representative that "those monies could be used to secure" the loan, and the insurers' McPherson "supported" the proposal. Id. at 48, 228-29. Holsworth could not recall with certainty the name of the A.I. Credit representative involved in the conference call, id. at 46, 225, but John Rago, A.I. Credit's vice president of credit, averred that he participated in an April 1996 conference call involving at least two of the participants Monon's Holsworth identified: Franklin and Peterson. When asked if Rago was the A.I. Credit representative on the call, Holsworth testified that he recognized Rago's name and confirmed that Rago "could" have been the A.I. Credit representative. Id. at 226, 46.

Shortly after the conference call, on April 22, 1996, A.I. Credit entered a written agreement to finance the premiums on Monon's Legion and Mutual policies, secured by the return premiums and the right to cancel the policies if Monon defaulted on its payments. Had the loan in fact been secured by the policies, this provision would have provided A.I. Credit with an effective collection mechanism: Indiana law requires companies like Monon to carry workers' compensation insurance, see Ind. Code sec. 22-3-2-5(a); cancellation of the necessary policy could force Monon to cease operations. A.I. Credit wired the money--$2,695,262.62--to the broker, Peterson, on April 23. Peterson then faxed Monon's Holsworth a letter informing him that he had used the bulk of the proceeds--$2,675,000--to pay CFI. None of the money was sent to Legion or Mutual.

A.I. Credit entered a second written loan agreement with Monon in May 1996, purportedly to finance an "audit" premium--an additional premium due based on an audit that revealed Monon's actual payroll for the 1995-96 policy period exceeded the estimates on which the

original premium was based. This agreement, too, purportedly permitted A.I. Credit to cancel the policy for nonpayment. A.I. Credit again wired the proceeds--$954,098--to Monon's broker, Peterson, and Peterson again wrote Monon's controller, Holsworth, this time explaining that, although A.I. Credit was "treat[ing]" the loan as financing for "an additional premium to the Workers Compensation policy," he had used the loan proceeds to pay a debt Monon owed Anthem. There was evidence that no audit premium was ever due: the insurers' McPherson testified that no such premium was assessed, and Holsworth described the purported audit as "the workers' comp[ensation] audit that didn't exist." (Holsworth Dep. at 178.)

Two A.I. Credit employees who participated in the loan approval process offered evidence that they relied on Franklin's and McPherson's representations. A.I. Credit vice president Rago attested that A.I. Credit would not have made either loan without his recommendation, that he recommended the April loan based on representations made to him during the conference call to the effect that the money was needed to pay Monon's 1996-97 premiums, and that he would not have approved the loan had he known Monon had obtained other financing. Cindy Carroll, the manager of A.I. Credit's Boston branch, testified by deposition that McPherson "[c]onfirm[ed]" the amount of the fictitious audit premium on which the May loan was based (Carroll Dep. at 164), and later attested in a supplemental affidavit that she would have withheld her approval had she known no such premium was due (Carroll Aff. para. 9). Carroll also attested that, had she discovered the Anthem financing after A.I. Credit entered the May loan agreement, she would immediately have taken steps to collect the debt and realize the collateral. Id.

Anthem and A.I. Credit both notified Legion that they had entered premium finance contracts with Monon for the same policy, and a Legion employee eventually brought the matter to the attention of the insurers' McPherson in early June. McPherson never consulted A.I. Credit, however, and Monon was placed into involuntary bankruptcy on September 25, 1996--still owing $2,657,144.42 to A.I.

Credit. Monon's internal accounting records show it had over $3 million in available cash as late as the end of June.

A.I. Credit's second amended complaint alleges that Monon's Franklin, the insurers' McPherson, and the broker, Peterson, conspired to defraud A.I. Credit. A.I. Credit also charges Franklin and McPherson with fraud (both actual and constructive) and McPherson with professional negligence. The complaint further alleges that Commonwealth, Legion, and Mutual are liable for McPherson's torts because he acted as their agent.

II.

A.I. Credit's conspiracy claim is based on the theory that the broker, Peterson, Monon's Franklin, and the insurers' McPherson acted in concert to defraud A.I. Credit by convincing it to provide financing that was essentially unsecured. We think a jury could conclude that such a conspiracy existed: McPherson made crucial misrepresentations to A.I. Credit, A.I. Credit forwarded the loan proceeds to Monon's broker, Peterson, and Peterson applied the proceeds to Monon's debts rather than its insurance premiums. The fact that Peterson used the loan proceeds to pay Monon's debts rather than embezzling the funds or using them to pay premiums as intended by A.I. Credit makes patent that someone at Monon was involved in the fraud; Franklin's misrepresentations to A.I. Credit suggest that Franklin was that insider. This sequence of coordinated acts is precisely the sort of evidence upon which a reasonable jury could base a finding of conspiracy, see, e.g., Moore v. Fletcher, 196 N.E.2d 422, 435 (Ind. Ct. App. 1964), and thus hold Franklin and McPherson responsible for Peterson's acts (and statements in furtherance of the conspiracy), see, e.g., Baker v. State Bank of Akron, 44 N.E.2d 257, 260 (Ind. App. 1942), as well as each other's.

A.I. Credit premises its actual fraud claim against Franklin and McPherson on statements made to Rago and Carroll. To prove "actual" fraud under Indiana law, the defrauded party must establish that it was injured as a result of its justifiable reliance on a material

misrepresentation of fact and that the misrepresentation was made with knowledge of its falsity and in an effort to induce reliance. See, e.g., Baxter v. I.S.T.A. Ins. Trust, 749 N.E.2d 47, 52 (Ind. Ct. App. 2001); Darst v. Ill. Farmers Ins. Co., 716 N.E.2d 579, 581-82 (Ind. Ct. App. 1999).

Here, a reasonable jury might find actual fraud by concluding that A.I. Credit's Rago relied on two separate mis representations made during the conference call: the implicit misrepresentation that Monon was in need of premium financing, and the explicit misrepresentation that the loan Monon sought could be secured with an interest in the "Mutual Indemnity workers' comp. balance." Indeed, a jury might view the very fact that A.I. Credit lent Monon more than $2 million as evidence that some misrepresentation regarding the purpose of the loan was made, reasoning that only the security provided by the right to cancel a necessary insurance policy would induce A.I. Credit to lend such an amount. A jury might conclude that A.I. Credit's Rago relied on Franklin's proposal to collateralize the loan and his concomitant implication that the proposed collateral was unencumbered. Given the evidence that Franklin previously had signed a loan agreement granting this very same security interest to Anthem, a jury could further conclude Franklin knew this implicit assertion was false and made it in an effort to induce A.I. Credit to make the loan. Similarly, McPherson's "confirmation" to A.I. Credit's Carroll of the amount of the fictitious audit premium, given Carroll's testimony that she would have blocked or cancelled the second loan had she known no premium was due, permits a finding that McPherson engaged in actual fraud as well.

Franklin's only objection to this theory is that A.I. Credit's Rago had no right to rely on anything he might have told him. But Indiana law permits as much reliance as is reasonable, see Wright v. Pennamped, 657 N.E.2d 1223, 1231 (Ind. Ct. App. 1995), and Franklin does not explain how Rago's reliance on his representation that the collateral was unencumbered was anything other than reasonable. No evidence suggests that Rago deliberately ignored facts known to

him, or even that Rago could have discovered Anthem's superior security interest had he tried. On the contrary, A.I. Credit asserted at oral argument that the nature of the security interest in question was such that it was forced to rely on Monon's assertions, and nothing in the record contradicts this assertion. Cf. Plymale v. Upright, 419 N.E.2d 756, 761 (Ind. Ct. App. 1981) (reliance not reasonable where facts are equally available to both parties). The reasonableness of reliance is generally, and in this case, a question for the jury. See McWaters v. Parker, 995 F.2d 1366, 1374 (7th Cir. 1993) (collecting Indiana cases).

A.I. Credit's constructive fraud claim is premised on Franklin's and McPherson's failures to disclose the Anthem financing. Constructive fraud arises by operation of law when one party violates a duty existing by virtue of his relationship with another party and gains an unconscionable advantage as a result. See, e.g., Wells v. Stone City Bank, 691 N.E.2d 1246, 1250-51 (Ind. Ct. App. 1998); Wright, 657 N.E.2d at 1232-33. A reasonable jury might find this claim supported by concluding that both Monon's Franklin and the insurers' McPherson possessed knowledge not available to A.I. Credit--namely that another finance company had already financed the premiums and obtained a security interest in the reserve fund--and that they both gained an unjust advantage when they induced A.I. Credit to make the loan by concealing the Anthem financing: Franklin obtained money his cash-strapped company desperately needed, and McPherson ingratiated himself with one of his most profitable clients. A jury could further find that this conduct violated a duty that arose out of the parties' borrower-lender relationship. See, e.g., Wells, 691 N.E.2d at 1251 (constructive fraud may arise from buyer-seller relationship).

In the alternative, A.I. Credit asserts that McPherson acted negligently, if not fraudulently, in failing to disclose the Anthem financing to Rago and Carroll and in "confirming" to Carroll the amount of the fictitious audit premium. The district court disposed of this claim by relying on the economic loss rule, which limits the recovery of "economic loss"--

profits lost due to a product's failure to perform as expected--to cases where a product failure causes personal injury or damage to other property. See Bamberger & Feibleman v. Indianapolis Power & Light Co., 665 N.E.2d 933, 938 (Ind. Ct. App. 1996). But A.I. Credit's damages are in no way the result of product failure; its loss thus is not "economic" in the sense of the rule. Indiana courts have specifically explained that the rule does not apply outside the product failure context. See Runde v. Vigus Realty, Inc., 617 N.E.2d 572, 575 (Ind. Ct. App. 1993) ("[The economic loss rule] appears to pertain to a negligence action for economic loss to a product caused by a defect in the product . . . . We fail to see any justification for expanding the rule to preclude the recovery of economic loss in other actions for negligence."). See also Bamberger & Feibleman, 665 N.E.2d at 938 (noting reluctance to extend economic loss rule to all negligence actions). Thus, the economic loss rule is inapplicable to this case.

McPherson insists he cannot be liable for negligence because A.I. Credit was not a party to Monon's insurance contract with the MRM companies, and thus he owed no duty to A.I. Credit. But this observation is not conclusive, because under Indiana law the duty of a professional (like McPherson) runs to third parties (like A.I. Credit) the pro fessional knows will rely on the information he provides. See Webb v. Jarvis, 575 N.E.2d 992, 996-97 (Ind. 1991); Essex v. Ryan, 446 N.E.2d 368, 372 (Ind. Ct. App. 1983). Contrary to McPherson's assertions, the Indiana Supreme Court has refused to limit this exception to the privity requirement to situations where the relying third party risks physical injury. See Webb, 575 N.E.2d at 996 ("The imposition of a duty should not be dependent upon the nature of damages which flow as a result of its breach."). We make no comment on the merits of A.I. Credit's negligence claim other than to note that a duty may have existed in these circumstances if Monon's insurance contract with Legion obligated Legion to provide accurate policy information to third-party finance companies like A.I. Credit and McPherson breached that duty by providing Rago or Carroll with incorrect information. See Essex, 446 N.E.2d at 370-71 (recognizing

claim for professional negligence based on failure to skillfully discharge contractual obligation). The district court will be free to reexamine this issue on remand. Although we have discussed A.I. Credit's four theories of liability, we are mindful that findings supporting one theory may moot others.

Finally, A.I. Credit alleges that Commonwealth, Legion, and Mutual are liable for McPherson's torts because he acted as their agent. Agency may be proved by the principal's consent and control of the agent and the agent's acquiescence, see, e.g., Woodworth v. Estate of Yunker, 673 N.E.2d 825, 827 (Ind. Ct. App. 1996), and any actions by a corporate agent within the scope of his employment are attributable to the corporation, see Mid-Continent Paper Converters, Inc. v. Brady, Ware & Schoenfeld, Inc., 715 N.E.2d 906, 909 (Ind. Ct. App. 1999). Here, a reasonable jury could conclude that Commonwealth, Legion, and Mutual consented to have McPherson act on their behalf: Commonwealth was McPherson's employer, Legion's treasurer testified that McPherson dealt with premium finance companies, and Mutual's president confirmed that McPherson was Monon's "account executive." A reasonable jury could further conclude that McPherson acquiesced to the agency relationship and that Legion and Mutual exerted control over McPherson's activities by retaining the authority to reject any insurance programs he structured using their policies. Based on these facts, a jury could find Commonwealth, Legion, and Mutual liable for any torts McPherson committed in the scope of his dealings with A.I. Credit.

The remainder of McPherson's arguments, which primarily concern the admissibility of the evidence on which A.I. Credit relied in opposing his motion for summary judgment, do not undermine our conclusions. McPherson notes that John Rago of A.I. Credit testified in his deposition that he never spoke with McPherson, and suggests in a footnote that A.I. Credit may not rely on Holsworth's testimony that McPherson participated in the April conference call "because Rago was A.I.'s Rule 30(b)(6) witness." One sentence of the Rule provides, "The persons so designated

shall testify as to matters known or reasonably available to the organization." In the light of that sentence, McPherson apparently construes the Rule as absolutely binding a corporate party to its designee's recollection unless the corporation shows that contrary information was not known to it or was inaccessible. Nothing in the advisory committee notes indicates that the Rule goes so far. McPherson cites Rainey v. American Forest & Paper Ass'n, Inc., 26 F. Supp. 2d 82, 94 (D. D.C. 1998), in support, but two other district courts have reached different conclusions and we think theirs is the sounder view. See Indus. Hard Chrome, Ltd. v. Hetran, Inc., 92 F. Supp. 2d 786, 791 (N.D. Ill. 2000) ("testimony given at a Rule 30(b)(6) deposition is evidence which, like any other deposition testimony, can be contradicted and used for impeachment purposes"); United States v. Taylor, 166 F.R.D. 356, 362 n.6 (M.D. N.C. 1996) (testimony of Rule 30(b)(6) designee does not bind corporation in sense of judicial admission). Because Holsworth's testimony can be construed to mean that McPherson did participate in a conference call with Rago, the issue is one for the jury.

  McPherson also suggests that Holsworth's testimony about the conference call is inadmissible because Holsworth did not testify to a "foundation," which McPherson insists entails specific testimony regarding the names of the par ticipants and the date of the conversation. But no rule of evidence requires a "foundation"; "foundation" is simply a loose term for preliminary questions designed to establish that evidence is admissible. See Black's Law Dictionary 666 (7th ed. 1999). At trial, it is sometimes considered an orderly procedure to produce testimony that a conversation occurred at a particular time and place and between the witness and someone else before the witness is permitted to testify to the conversation's content. The Federal Rules of Evidence provide that relevant evidence is generally admissible, see Fed. R. Evid. 402, and McPherson does not contend that Holsworth's testimony is irrelevant. We find no reason--relevance or otherwise--why the testimony should be excluded. Though Holsworth's testimony regarding the identity of the A.I. Credit representative and the date of the

conversation was inexact, it was specific enough to demonstrate the conversation's occurrence and relevance. See Fed. R. Evid. 401 (evidence is relevant if it bears on the existence of any fact of consequence to the determination of the action).

McPherson next argues that Cindy Carroll's affidavit is inadmissible because it contradicts her earlier deposition testimony, but the "inconsistency" to which McPherson points is nonexistent. Carroll stated in her affidavit that when she spoke with McPherson, he told her "nothing that significantly deviated" from her understanding of Monon's insurance program; McPherson insists this statement is inconsistent with Carroll's deposition testimony that she could not recall "specific sentences that were discussed" during the call. These two statements are plainly not inconsistent, and provide no basis for excluding Carroll's affidavit. We need not address McPherson's objections to other evidence on which A.I. Credit relies in its brief because the evidence discussed above is sufficient for A.I. Credit to withstand summary judgment.

Finally, McPherson asserts that A.I. Credit's failure to allege his participation in the conference call in its complaint violates Federal Rule of Civil Procedure 9(b)'s requirement that fraud be alleged with particularity. Because both A.I. Credit and McPherson squarely addressed this fraud theory at the hearing on McPherson's motion for summary judgment, however, we conclude that A.I. Credit's second amended complaint was constructively amended to include this theory. See Whitaker v. T.J. Snow Co., 151 F.3d 661, 663 (7th Cir. 1998); Walton v. Jennings Cmty. Hosp., Inc., 875 F.2d 1317, 1320 n.3 (7th Cir. 1989).

For the foregoing reasons, the judgment of the district court is Reversed and the case REMANDED for further proceedings.

FOOTNOTE

/1 Jurisdiction is founded on diversity. The parties agree that Indiana law controls all substantive issues.