In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-3549

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

NORA PENALOZA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 117-1—**Joan Humphrey Lefkow**, *Judge.*

ARGUED OCTOBER 26, 2010—DECIDED AUGUST 5, 2011

Before POSNER, FLAUM, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* In November 2006 Nora Penaloza drove from New Jersey to Bedford Park, Illinois, where she met with a man named "Carlos" in the parking lot of a motel. "Carlos" loaded three duffel bags containing packages wrapped in brown tape into Penaloza's car. Penaloza then began to drive back to New Jersey. Agents from the Drug Enforcement Administration ("DEA") stopped Penaloza, questioned her about the duffel bags,

and seized them. Penaloza was indicted for attempting to possess with intent to distribute over five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1).

During Penaloza's trial, the jury heard the testimony of Mario Elias, a DEA agent who was undercover as "Carlos." Elias explained that his transaction with Penaloza developed out of an investigation into the activities of Jorge Gutierrez, a suspected broker for a Colombian drug-trafficking organization. Elias testified that in his undercover identity as "Carlos," he had agreed to help Gutierrez transport a large shipment of cocaine. Gutierrez told him to call Penaloza's phone number to make arrangements for delivery of part of this shipment. Over multiple taped phone conversations, Elias and Penaloza made plans to meet at the motel parking lot near Chicago where he delivered the three duffel bags containing sham cocaine to Penaloza. The government also introduced the testimony of David Brazao, one of the DEA agents who stopped Penaloza en route to New Jersey. Brazao testified that Penaloza confessed to the agents that she understood the duffel bags contained drugs.

The jury convicted Penaloza, and she was sentenced to 120 months of imprisonment. Penaloza appeals, arguing that (1) the district court erred in admitting Elias's testimony about her connections to Gutierrez because it was hearsay and unfairly prejudicial; (2) the admission of this evidence amounted to a constructive amendment of the indictment in violation of the Fifth Amendment; and (3) the district court erred in admitting

Agent Brazao's testimony about her confession because it lacked foundation and was unfairly prejudicial. Each of these arguments lacks merit, and we affirm.

## I. Background

During the course of its investigation into Jorge Gutierrez, also known as "Elivardo," the DEA obtained the assistance of a confidential informant ("CI") who worked for Gutierrez. The CI introduced Agent Elias to Gutierrez as "Carlos," a narcotics transporter who could help them make international deliveries of cocaine. In early 2006 Gutierrez arranged for the CI and "Carlos" to transport 200 kilograms of cocaine from Colombia to Spain.

Unbeknownst to Gutierrez, the DEA, in conjunction with Spanish law-enforcement authorities, intercepted and seized this shipment of cocaine. Elias contacted Gutierrez and told him a cover story so the DEA could continue its investigation. Elias told Gutierrez that when he arrived in Spain to make the delivery, the buyers were unable to pay for the cocaine and asked for credit. Elias said he released 130 kilograms of the cocaine to the buyers and held the remaining 70 kilograms as collateral to ensure that they followed through with payment. Elias later told Gutierrez that he was bringing the 70 kilograms back to the United States and would hold it for Gutierrez to find another buyer.

Gutierrez eventually found a buyer. In early November 2006, the CI gave Elias a phone number and told him to call "Chavelo" to negotiate delivery of the 70 kilograms

of cocaine. Separately, Gutierrez contacted Elias and also told him to call "Chavelo" at the same number. Elias called the number but no one picked up. About 15 minutes later, a woman called Elias back from the number. Elias did not know the identity of the speaker; he understood "Chavelo" to be a code name or nickname, and the caller did not identify herself by name. After numerous subsequent conversations and an eventual in-person meeting to deliver the cocaine, however, Elias identified Penaloza as the person in all the calls.

From November 6 to November 9, 2006, Elias taped nine phone conversations with Penaloza during which they tersely discussed the planned transaction using code words. All the conversations were in Spanish. During Elias's first phone conversation with Penaloza, he introduced himself as "Carlos" and told her he was "calling on behalf of Elivardo." Penaloza responded, "Ah, let's see, what can I say, I would . . . I would have to call you back. Or if it's not me, it will be my cousin Leo." Later that evening, Penaloza called Elias again. She said she had spoken with her "cousin" and "he told me if you were ready . . . that I'm the one who's picking up the keys." Elias understood "keys"—"*llaves*" in Spanish—to be a street term for kilograms. Elias then asked Penaloza whether she was "bringing a car that's ready." Penaloza answered, "[A]h, let's see . . . I'd say no. Not really." Elias responded, "[T]he only thing that I said to Elivardo, was, that I needed for you to bring a car that was ready . . . so that I could go and take it, load the family and give it to you . . . ." According to the trial testimony of an FBI narcotics investigator, "family" is a code word for a

shipment of cocaine. In a conversation the following day, Penaloza stated, "[T]he only thing I have to do is go pick up the keys . . . . I don't have to take anything else?" Elias understood her to be referring to purchase money for the cocaine and answered "no," but added, "I need a car that's set up," by which he meant a car with a hidden compartment. Penaloza answered, "I have a Pontiac but it's little . . . . [Y]ou need a big one, right?" Elias responded, "[D]oes it have some place . . . to hide that, or not?" Penaloza replied, "No," and Elias stated, "Well, it can be put in the back . . . in the trunk, then . . . there's seventy." A few hours later, Penaloza again called Elias, and Elias asked her if the car had a "*clavo*," a Spanish slang term for a hidden compartment.

Penaloza and Elias planned to meet on the morning of November 9, 2006, in the parking lot of the Sleep Inn motel in Bedford Park, Illinois, near Chicago. When they met, Penaloza said to Elias, "Leo told me to . . . ask you if everything was OK[,] well-packed and the appearance good and everything." Elias responded, "Everything's fine. I had to put it . . . double in each package . . . so it wouldn't be . . . so bulky." Penaloza then gave Elias the keys to her SUV, which Elias drove to another location to load with three black duffel bags containing sham cocaine wrapped in brown tape. Elias then drove the car back to the motel parking lot where he explained to Penaloza, "The packages are one and a half each one, because . . . of the way we had to send them over here." The tape recording of this conversation captured a zipping sound from the duffel bags as Elias explained how the cocaine was packaged, and surveillance agents

photographed Elias and Penaloza while they stood at the SUV. To conclude the transaction, Elias called Gutierrez and handed the phone to Penaloza. He asked Penaloza to "[t]ell him I took good care of you so he won't bother me." Penaloza took the phone and said, "Carlos was very proper, OK? He took care of me. He was very worried about me."

Penaloza then began to drive back to New Jersey, and DEA agents followed her for about 45 minutes before stopping her in Indiana. The agents read Penaloza her *Miranda* warnings and then asked her about the cocaine in her car. According to the police report summarizing the stop, Penaloza initially said she had traveled to Chicago as a Mary Kay Cosmetics representative, had just checked out of her hotel, and did not know how the three duffel bags ended up in her car. On further questioning, however, Penaloza admitted this was untrue and told the agents that her cousin had offered her $500 to go to Chicago to retrieve some packages and bring them back to New Jersey. When asked if she knew whether the bags in her car contained drugs, Penaloza said, "Yes." The agents seized the duffel bags and let Penaloza return to New Jersey.

A grand jury later indicted Penaloza for attempting to possess more than five kilograms of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). The government moved in limine to introduce certain background information about the DEA's investigation of Gutierrez. It asked the court to allow the introduction of evidence that the DEA had been investigating

Gutierrez; that Elias and Gutierrez had negotiated the transportation of cocaine to Spain; that Elias told Gutierrez that the Spanish buyers failed to pay and asked Gutierrez to find a buyer for the 70 kilograms of cocaine in the United States; and that Gutierrez subsequently provided Elias with Penaloza's phone number to arrange for delivery of the 70 kilograms of cocaine. The government said the purpose of this evidence was to provide the jury with context about why Elias contacted and ultimately met with Penaloza.

The government also sought to introduce certain statements by Gutierrez inculpating Penaloza, invoking Rule 801(d)(2)(E) of the Federal Rules of Evidence, which provides that statements by a defendant's coconspirator made during the course and in furtherance of the conspiracy are not inadmissible hearsay. Pursuant to *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), the government submitted a written proffer to the district court to try to establish the required preliminary showing that Penaloza and Gutierrez were indeed coconspirators. In the proffer the government reiterated the same background evidence from its motion in limine and argued that it showed that Penaloza and Gutierrez were coconspirators. The government also pointed to some statements by Gutierrez arguably referring to Penaloza, as well as Penaloza's statements on the phone to Gutierrez after she received the duffel bags from Elias.

The district court found the *Santiago* proffer insufficient to establish a conspiracy existed between Penaloza

and Gutierrez and barred the government from admitting Gutierrez's statements. At the same time, however, the court granted the government's motion in limine, permitting it to introduce the background evidence of the DEA's investigation of Gutierrez as context for Elias's contacts with Penaloza. At trial the government introduced this background through the testimony of Elias, who described his introduction to Gutierrez in early 2006 and relevant steps in the investigation leading up to his in-person meeting with Penaloza in November of that year.

Agent David Brazao also testified for the government, describing how he and the other officers stopped Penaloza en route to New Jersey. Brazao explained that he was part of the surveillance team that observed the meeting between Penaloza and Elias on the morning of November 9, 2006. After the transaction was completed, Brazao and other officers followed Penaloza's car on the highway for about 45 minutes before initiating a traffic stop near Portage, Indiana. Brazao testified that Penaloza eventually "came clean with us and said, 'Yes, I knew it was drugs'" in the duffel bags.

Penaloza testified in her own defense. Her story was that her brother in Montreal, Canada, asked her to go to Chicago to pick up some parts and tools for his auto-repair shop. She said her brother told her that her cousin Leo knew people in Chicago who would give her the "*llaves,*" which she thought referred to the parts and tools. Penaloza presented a Spanish-language expert who testified that the most common meaning

of *"llaves"* is "keys," but that the word can also mean "wrenches" or "faucets." The expert admitted, however, that the government's interpreter had correctly translated *"llaves"* as "keys" in the context of the taped conversations in this case and that the government's translations were overall "very good." Penaloza testified that she believed her cousin Leo had arranged for the call she received from "Carlos" and that throughout her conversations with "Carlos" about the *"llaves,"* she thought they were talking about tools, not cocaine.

The jury convicted Penaloza on the sole charge of attempt to possess with intent to distribute more than five kilograms of cocaine. Penaloza was sentenced to 120 months of imprisonment.

## II.  Analysis

### A.  Evidence of Penaloza's Connections to Gutierrez

We review a district court's evidentiary rulings for abuse of discretion. *Romanelli v. Suliene*, 615 F.3d 847, 854 (7th Cir. 2010). Penaloza first challenges the admission of evidence relating to the DEA's investigation of Gutierrez. The district court allowed the government to elicit this testimony to give the jury some context for Agent Elias's contacts with Penaloza. This evidence was not hearsay, as Penaloza contends; it was not offered for the truth of the matter asserted but rather for the purpose of explaining why the agent took the investigative steps that he did. *See United States v. Mancillas*, 580 F.2d 1301, 1309 (7th Cir. 1978); *see also, e.g., United States*

*v. Powers*, 500 F.3d 500, 508 (6th Cir. 2007); *United States v. Castellini*, 392 F.3d 35, 52 (1st Cir. 2004); *United States v. Wilson*, 107 F.3d 774, 781 (10th Cir. 1997); *United States v. Collins*, 996 F.2d 950, 953 (8th Cir. 1993). Had the government presented Penaloza's taped phone calls without first providing some background about the DEA investigation of Gutierrez, there would have been confusing and unexplained gaps in the story. How did Elias obtain Penaloza's phone number and why did he call it? Who was "Elivardo" and what was the significance of the reference to 70 kilograms of cocaine? Elias's limited testimony about his related prior dealings with Gutierrez gave the jury the contextual information necessary to understand the significance of these references in the taped phone conversations.

Background information of this sort is not hearsay, but it may be inadmissible under Rule 403 of the Federal Rules of Evidence if the danger of unfair prejudice substantially outweighs its probative value. *United States v. Bradshaw*, 719 F.2d 907, 920 (7th Cir. 1983) (citing *Mancillas*, 580 F.2d at 1310). Penaloza argues that admitting this background information in her trial was unfairly prejudicial because it cast her as part of an international narcotics conspiracy and went into more detail than necessary.

Penaloza overstates the prejudicial effect of the background evidence actually admitted at trial. Agent Elias did not testify at length or in any significant detail about the Gutierrez investigation. This part of his testimony began with his negotiations with Gutierrez for

the Spanish cocaine delivery and ended with his first call to Penaloza's phone number; it spans just over four pages of a 55-page direct-examination transcript. His testimony about Penaloza's involvement was limited to the facts of the charged cocaine transaction; he did not try to paint her as more broadly involved with Gutierrez than this singular transaction itself would suggest. The district court did not abuse its discretion in admitting this limited background information about the DEA's investigation of Gutierrez.

Moreover, any error (if there was error) was harmless. *See, e.g., United States v. Cooper*, 591 F.3d 582, 590 (7th Cir. 2010) (an error is harmful only if in the mind of an average juror the prosecution's case would have been significantly less persuasive had the improper evidence been excluded). *Id.* Here, the government introduced nine tape-recorded conversations against Penaloza that captured her conversations regarding whether her car was properly "set up" as a drug-courier vehicle. These conversation contained code words—"keys," "family," and "*clavo*"—for drugs and hidden compartments. When Penaloza met Elias in the parking lot, she asked him whether everything was "well-packed and the appearance good and everything." There were surveillance photographs of this meeting. Penaloza permitted Elias to drive her car to another location to load the duffel bags. And upon his return, the recording captured a zipping sound, consistent with Elias's testimony that he showed Penaloza the packages of sham cocaine inside the bags. As if more were needed, Agent Brazao testified that Penaloza confessed to knowing that the

bags contained drugs. In light of this overwhelming evidence, any error in admitting the limited background evidence of the Gutierrez investigation was harmless.

Penaloza also suggests that the government's introduction of this background evidence circumvented the district court's rejection of the government's *Santiago* proffer. The district court held that the government could not admit statements that Gutierrez made to or about Penaloza under Rule 801(d)(2)(E) because the government had not proven by a preponderance of the evidence that Gutierrez and Penaloza were coconspirators. It is true that there was some overlap between the *Santiago* proffer and the government's summary of its anticipated background evidence about the Gutierrez investigation. But the district court distinguished between these categories of evidence; while rejecting the *Santiago* proffer and excluding admission of Gutierrez's statements, the court permitted Agent Elias to place some limited background information about the Gutierrez investigation before the jury. Thus, the government did not "circumvent" anything.

Penaloza also objects to the admission of the statements she made to Gutierrez on the phone after she received the duffel bags from Elias. She argues that these statements could not be background evidence because they were made *after* her transaction with Elias. As such, she claims that they fell within the scope of the rejected *Santiago* proffer. Again, Penaloza misconstrues the district court's ruling. The court barred the admission of Gutierrez's statements under Rule 801(d)(2)(E), but

explicitly reserved judgment on the possibility that some of the evidence pertaining to Gutierrez "may, in whole or in part, be otherwise admissible." After Penaloza inspected the sham cocaine Elias had placed in her car, Elias handed her the phone, told her Elivardo was on the line, and asked her to "[t]ell him I took good care of you so he won't bother me." Penaloza took the phone and said, "Carlos was very proper, OK? He took care of me. He was very worried about me." These were *her* words, not Gutierrez's, and they were admissible as her own statements under Rule 801(d)(2)(A). Moreover, they were not offered to prove the truth of the matter asserted—that "Carlos" treated her well—but rather to show that Penaloza understood him to be a narcotics transporter who wanted her to confirm to his boss he had completed the delivery smoothly. This was not an end-run around the court's rejection of the *Santiago* proffer.

Finally, the admission of Penaloza's statements on the phone as the transaction was completed was not unfairly prejudicial under Rule 403. Penaloza contends that the jury might have been misled into believing that she was part of Gutierrez's narcotics network. Again, Gutierrez's side of the conversation was not admitted, and Penaloza's statements are ambiguous about how well she knew Gutierrez. The probative value of this brief phone conversation was to show that she complied with Elias's request to confirm that the delivery had been successfully completed. There was nothing unfairly prejudicial about the admission of this evidence.

**B. Constructive Amendment**

Penaloza also claims that the government constructively amended the indictment by introducing evidence that implicated her in a drug conspiracy. The Fifth Amendment protects a defendant from being convicted of an offense for which a grand jury has not indicted her. *United States v. Haskins*, 511 F.3d 688, 692 (7th Cir. 2007). A constructive amendment to an indictment, and thus a violation of the Fifth Amendment, occurs "when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both, broadens the possible bases for conviction beyond those presented by the grand jury." *United States v. Crowder*, 588 F.3d 929, 938 (7th Cir. 2009) (quotation marks omitted). The purpose of the rule against constructive amendments is to give the defendant reasonable notice so that she can prepare a defense and to ensure that the defendant is not subject to, in effect, a second prosecution. *United States v. Trennel*, 290 F.3d 881, 887-88 (7th Cir. 2002).

Penaloza failed to preserve this issue in the district court, so our review is for plain error. *See, e.g., United States v. Presbitero*, 569 F.3d 691, 698 (7th Cir. 2009). There was no error at all. The indictment charged Penaloza with one count of attempting to possess with intent to distribute more than five kilograms of cocaine. There is simply no basis for Penaloza's assertion that the government introduced evidence that she was guilty of conspiracy in addition to or instead of attempt. As we have discussed, the government was careful to limit its

evidence of a link between Penaloza and Gutierrez to two key facts, both of which pertained to the charged transaction: (1) that in connection with a November 2006 delivery of the 70 kilos of cocaine reserved from the earlier Spanish drug sale, Gutierrez had provided Elias with a phone number that turned out to be Penaloza's; and (2) that Penaloza spoke to Gutierrez on the phone after receiving the sham cocaine to confirm that the delivery was complete. Neither the government nor the district court ever suggested that Penaloza conspired with Gutierrez. The government's opening statement and closing argument, and the court's jury instructions, were strictly confined to the charged offense of attempted possession. There was no constructive amendment of the indictment.

## C.  Agent Brazao's Testimony

Finally, Penaloza argues that the district court should not have admitted Agent Brazao's testimony about her confession because it lacked foundation. She contends that Brazao was not the officer who interrogated her, did not author the investigative report documenting the traffic stop, and was not sufficiently specific about which agents and what questions elicited her incriminating statements. In addition, she claims that Brazao's testimony, when coupled with the evidence improperly linking her to a conspiracy led by Gutierrez, unfairly prejudiced the jury against her.

Brazao's testimony about Penaloza's confession was a routine and entirely permissible introduction of a

nonhearsay admission by a party-opponent. FED. R. EVID. 801(d)(2)(A) ("A statement is not hearsay if . . . [t]he statement is offered against a party and is the party's own statement, in either an individual or representative capacity . . . ."). Brazao was present when Penaloza confessed; it is immaterial that he was not the interrogating officer or the author of the investigative report. Penaloza's contention that the government needed to provide a stronger foundation for the testimony is meritless. "[N]o rule of evidence requires a 'foundation'; 'foundation' is simply a loose term for preliminary questions designed to establish that evidence is admissible." *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637-38 (7th Cir. 2001). It may be good practice and "orderly procedure" for a witness to establish that "a conversation occurred at a particular time and place and between the witness and someone else before the witness . . . testif[ies] to the conversation's content," but Brazao's testimony covered these "foundational" facts. *Id.* at 638. Nothing more was required. *See id.* (witness's testimony about a conversation was "specific enough to demonstrate the conversation's occurrence and relevance" and therefore admissible, even if the witness did not identify all the participants in or the exact date of the conversation).

Penaloza also suggests that Brazao's testimony was unfairly prejudicial because by the time the jury heard it, the jury had already been "inculcated with the notion that she was a part of an international drug conspiracy." This is nothing more than a redundant objection to the background evidence about the Gutierrez

investigation and Penaloza's call to Gutierrez, which, as we have explained, the district court properly admitted.

AFFIRMED.