In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2547

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RONALD LOVE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 09 CR 202—**Joseph S. Van Bokkelen**, *Judge.*

ARGUED SEPTEMBER 5, 2012—DECIDED FEBRUARY 7, 2013

Before POSNER, KANNE, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* A jury convicted Ronald Love of one count of distributing crack cocaine and one count of conspiring to distribute crack cocaine. He appealed, challenging his conviction and sentence on various grounds. For the reasons that follow, we affirm his conviction, vacate his sentence, and remand for resentencing.

## I. BACKGROUND

Viewed in the light most favorable to the government, *see United States v. Johns*, 686 F.3d 438, 450 (7th Cir. 2012), the evidence at trial showed as follows:

Landen Cowart first got in touch with the government in February 2009. Cowart, arrested for dealing Vicodin, was looking for a way out of jail. It is not clear whether he or the government made the first contact, but once both sides got together, they came to mutually beneficial agreement. Cowart agreed to act as a confidential informant ("CI"). In exchange, Cowart started accepting government money and his drug case "went away." (Trial Tr. at 255.) By April or May 2009, after spending thirteen months in jail, Cowart was released back onto the streets. By September 2009, he had been assigned a target: Ronald Love, alias "Black."

Cowart called Love and arranged to buy drugs from him. On September 9, 2009, an FBI task force, working with state and local law enforcement, gave Cowart marked money, wired him for sound and video, and sent agents to watch over him. Cowart made his way to the prearranged rendezvous point in Hammond, Indiana, parked his car, and waited. A white SUV circled the area. Eventually, the SUV parked behind Cowart's car. A man named Shelby Deloney approached and asked Cowart if he was "with Black." Cowart indicated that he was and gave Deloney $550. Deloney gave Cowart a bag of crack cocaine that Cowart promptly turned over to the police. Task force agents followed the white SUV as it left the scene. After following the SUV with

rotating teams on-and-off for roughly thirty blocks, they pulled the SUV over for blocking an alleyway. An officer found two men in the car. One of them told the officer that he was the one who had parked the car, and the police checked his ID. It was Ronald Love.[1] The officer gave Love a warning and let him go.

A couple of days later, Cowart's phone rang in the middle of the night. It was Love, and he was not happy. Apparently, someone had robbed one of Love's crack houses earlier that night and had taken both money and drugs. Love thought that Cowart was responsible. Cowart tried to calm Love down; he told Love he had nothing to do with the robbery and that he would try to find out who did it. Love called several more times that night before he finally left Cowart alone.

Thinking things had blown over, Cowart soon arranged another drug buy. Love agreed to meet again on September 14, 2009. Once again, the FBI task force gave Cowart buy money ($1,450 this time), wired him, and sent a surveillance team after him. Cowart parked in front of a Hammond, Indiana, home, met up with Love, and went inside.

Outside the house, the law enforcement surveillance team watched. They saw the same white SUV from September 9 park at a nearby gas station. Several people got out and walked toward the house. Then the surveillance

---

[1] The record does not indicate who the second passenger was, but it apparently was not Deloney—the second passenger was Caucasian, and Deloney is African-American.

team saw something unsettling. It was Cowart's car—or rather, a car the FBI gave Cowart for the operation—but Cowart was not inside. Instead, a man later identified as Robert Acklin was behind the wheel. Acklin moved the car to the gas station, parked, and walked back over to the house.

Back inside the house, Cowart and Love went into the kitchen, and Cowart gave Love the money. Love counted out the bills and went into the other room. When he came back, he had two other men—Robert Acklin and Shelby Deloney—in tow. Then the beating began. Cowart hit the floor and curled into a fetal position as Love interrogated him about the crack house robbery. The surveilling officers heard the commotion over Cowart's hidden microphone and swarmed into the house with weapons drawn. Inside, they found Love and Deloney standing over a bruised and bleeding Cowart. They placed Love and Deloney under arrest. Acklin fled through another door, but the officers eventually spotted him hiding behind a nearby shed, chased him down, and arrested him, too.

On October 9, 2009, a federal grand jury indicted Love for one count of distributing crack cocaine, *see* 21 U.S.C. § 841(a)(1), and one count of conspiring to distribute crack cocaine, *see* 21 U.S.C. § 846. The case was tried before a jury. Stipulated testimony from a chemist indicated that the substance recovered on September 9 was cocaine base (i.e., crack cocaine). Cowart testified extensively about his role as a CI. Phone logs, videotapes, audio recordings, and testimony from law enforce-

ment officers backed up much of his testimony. Wallace Muhammed testified that he had loaned the white SUV to Love, whom he knew as "Black." And Robert Acklin—one of Love's alleged co-conspirators—testified that he had dealt drugs with Love for several years and agreed to help him beat Cowart to avenge the crack house robbery. Love did not present witnesses in his defense. The jury convicted. Love appeals, arguing that (1) the evidence was insufficient to support his conviction; (2) the trial court improperly declined to give a "buyer-seller" jury instruction; (3) the trial court improperly admitted a hearsay statement; and (4) his sentence was improperly calculated. We address each challenge in turn.

## II. ANALYSIS

### A. Sufficiency of the Evidence

Love first argues that there was not enough evidence to support his conspiracy conviction. Love "bears a heavy burden" when walking this road. *United States v. Griffin*, 684 F.3d 691, 694 (7th Cir. 2012) (internal quotation marks omitted). To convict Love of conspiracy, the government had to prove that (1) two or more people agreed to commit an unlawful act; and (2) Love knowingly and intentionally joined in the agreement. *See United States v. Avila*, 557 F.3d 809, 814 (7th Cir. 2009). The jury found that the government did so here, and we afford "great deference" to that finding. *Id.* at 815. Thus, we review the evidence in the light most favorable to the government and ask whether any rational trier of

fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *United States v. Walker*, 673 F.3d 649, 654 (7th Cir. 2012).

Love argues that the government's evidence of conspiracy was not detailed enough—it proved at most "an agreement between Love, Acklin and Deloney to beat up and/or rob Cowart" and not an agreement to distribute crack. (Appellant's Br. at 19.) We respectfully disagree. Cowart arranged the September 9 drug deal with Love, but Deloney actually carried out the deal, and before he did so, he sought confirmation that Cowart was "with Black" (i.e., Love). Furthermore, Acklin testified that he and Love had been "dealing drugs together" for several years. (Trial Tr. at 312.) This evidence easily supports a reasonable inference that Love dealt drugs with help from Acklin and Deloney. And the September 14 beating provided further evidence. Acklin testified that Love called him and said that "the guy who robbed his crack house had some money, and he wanted to go out there and get it." (*Id.* at 313.) Cowart similarly testified that Love interrogated him about the crack house robberies during the beating. Based on this testimony, a rational jury could find that Love, Acklin, and Deloney all intentionally conspired together to defend Love's drug business. *Cf. United States v. Johnson*, 592 F.3d 749, 756 (7th Cir. 2010) ("an agreement to warn of future threats to each other's business stemming from competitors or law-enforcement authorities" is evidence of conspiracy); *United States v. Stephenson*, 53 F.3d 836, 844 (7th Cir. 1995) (attempt to rob a competitor

gave rise "to a strong inference that the attack was perpetrated as a part of King's overall drug conspiracy"); *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992) (defendant's offer to kill a rival was admissible as evidence of conspiracy because it showed defendant's "concern for the Organization's retail operations and the lengths to which [defendant] would go to defend them"). Accordingly, we think that there was sufficient evidence to support a conspiracy conviction.

## B. Buyer-Seller Instruction

Love next claims that his conspiracy conviction cannot stand because the district court refused to give a "buyer-seller" instruction. Because the district court declined to give an instruction on a theory of defense, our review is *de novo*. *United States v. Brack*, 188 F.3d 748, 761 (7th Cir. 1999).

Distributing drugs and conspiring to distribute drugs are two separate crimes. *Compare* 21 U.S.C. § 841 (drug distribution) *with* 21 U.S.C. § 846 (drug conspiracy). Drug distribution punishes the sale of drugs in its own right. *United States v. Askew*, 403 F.3d 496, 503 (7th Cir. 2005). Conspiracy, on the other hand, "punish[es] criminal objectives beyond the sale itself—most typically, the parties' agreement subsequently to distribute the drugs exchanged." *Id.* Thus, a sale of illegal drugs, without more, "cannot be the conspiracy, for it has no separate criminal object. What is required in such a case is an agreement to commit some other crime beyond the

crime constituted by the sale agreement itself." *United States v. Thomas*, 284 F.3d 746, 752 (7th Cir. 2002) (internal brackets omitted).

The difference between these concepts can be hard to wrap your head around. Accordingly, district courts should give a "buyer-seller" instruction explaining the difference where the jury could rationally find, from the evidence presented, that the defendant merely bought or sold drugs but did not engage in a conspiracy. *See United States v. Chavis*, 429 F.3d 662, 671-72 (7th Cir. 2005). In our circuit, a buyer-seller instruction usually looks like this:

> A conspiracy requires more than just a buyer-seller relationship between the defendant and another person. In addition, a buyer and seller of [name of drug] do not enter into a conspiracy to [distribute [name of drug]; possess [name of drug] with intent to distribute] simply because the buyer resells the [name of drug] to others, even if the seller knows that the buyer intends to resell the [name of drug].

> To establish that a [buyer; seller] knowingly became a member of a conspiracy with a [seller; buyer] to [distribute [name of drug]; possess [name of drug] with intent to distribute], the government must prove that the buyer and seller had the joint criminal objective of distributing [name of drug] to others.

7th Cir. Pattern Crim. Jury Inst. 5.10(A) (2012 ed.).

Love claims that he should have received a buyer-seller instruction here, but we are not convinced. A trial judge may reject instructions that would only confuse the jury. *See Guzman v. City of Chicago*, 689 F.3d 740, 745 (7th Cir. 2012); *United States v. Menting*, 166 F.3d 923, 928 (7th Cir. 1999). As a result, we have repeatedly held that a buyer-seller instruction is unnecessary where the instruction would contradict the defendant's theory of the case. *See. e.g., United States v. Eberhart*, 434 F.3d 935, 940 (7th Cir. 2006); *Chavis*, 429 F.3d at 672; *United States v. Fort*, 998 F.2d 542, 547 (7th Cir. 1993). Here, Love's theory of the case was that (1) he was not involved in the September 9 drug sale; and (2) the September 14 beating was just a beating and had nothing to do with drugs. In other words, Love argued that he was completely innocent of both the drug charge and the conspiracy charge. A buyer-seller instruction would have contradicted this theory. Thus, under our well-established precedent, he was not entitled to a buyer-seller instruction.

Love also argues that the jury might have improperly found a conspiracy based solely on a buyer-seller relationship between Love and Acklin. Acklin testified that he "dealt drugs with" Love and that he and Love "were involved in dealing drugs together." (Trial Tr. at 312.) Love speculates that the jury might have interpreted these statements to mean that Acklin and Love had a mere buyer-seller relationship. But Acklin testified that he dealt drugs *together with* Love, not that he merely bought from him or sold to him, and we do not see why the jury would have thought Acklin meant something

other than what he said. A defendant "is entitled to a buyer-seller instruction only if the instruction has some foundation in the evidence," *Askew*, 403 F.3d at 503; mere speculation is not enough. Here, the only evidence regarding Love's relationship with Acklin was that the two dealt drugs together. Accordingly, the district court properly declined to give a buyer-seller instruction.

### C.  Admission of Hearsay

Love next claims that the trial court improperly admitted evidence that should have been excluded as hearsay. We review this claim for abuse of discretion. *United States v. Penaloza*, 648 F.3d 539, 544 (7th Cir. 2011).

Fed. R. Evid. 801(c) defines hearsay as a "statement," and Fed. R. Evid. 801(a), defines a "statement" as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." As the 1972 advisory committee's note to Rule 801(a) further clarifies, the "key to the definition" of an assertion "is that nothing is an assertion unless intended to be one." Here, Cowart testified, over a hearsay objection, that Deloney asked if he was "with Black" during the September 9 drug deal. The government argues that this was a question, not a "statement" or an "assertion" and therefore was not hearsay. Love, on the other hand, argues that the question implicitly asserted Deloney's identity and confirmed his role in the deal. Because the phrase communicated this information, Love argues, it should have been excluded as hearsay.

Love's argument has some force. Questions seek information, but they convey information, too. A speaker who asks, "Son, is it raining outside?" clearly *intends* to get information about the weather, but the speaker also implicitly *communicates* information—for instance, that he or she is probably indoors, is interested in the weather, and has a son. This fact has led some commentators to argue that "we should view both imperatives and questions as 'statements' for purposes of the hearsay doctrine" because "both intentionally express and communicate ideas or information." 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 8:6 (3d ed. 2007).

Unfortunately for Love, the federal courts do not take this approach. We held in *United States v. Thomas* that questions are not "statements" and therefore are not hearsay. 453 F.3d 838, 845 (7th Cir. 2006).[2] Our sister circuits agree. *See, e.g., United States v. Thomas*, 451 F.3d 543, 548 (8th Cir. 2006); *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 330 (3d Cir. 2005); *United States v. Wright*, 343 F.3d 849, 865 (6th Cir. 2003); *United States v. Jackson*, 88 F.3d 845, 848 (10th Cir. 1996); *United States v. Lewis*, 902 F.2d 1176, 1179 (5th Cir. 1990); *United States*

---

[2]   The government also cites *United States v. Cassano,* 372 F.3d 868, 882-83 (7th Cir. 2004), for the same proposition, but the Supreme Court later vacated that decision on other grounds, *see Cassano v. United States,* 543 U.S. 1109, 1109 (2005). Accordingly, *Cassano* has no precedential force. *See Evans v. Circuit Court of Cook Cnty.*, 569 F.3d 665, 666-67 (7th Cir. 2009).

*v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990). Given this over-
whelming precedent, we think that Love's question
was not hearsay.

Love counters with *United States v. Summers*, 414 F.3d
1287 (10th Cir. 2005), but *Summers* is not to the contrary.
In *Summers*, a co-defendant being arrested for bank
robbery exclaimed to police, "How did you guys find us
so fast?" *Id.* at 1298. The trial court admitted the state-
ment, *id.*, but the Tenth Circuit held that it should
have been excluded, *id.* at 1300. "It begs credulity," the
court wrote, "to assume that in [posing] the question
[the declarant] was exclusively interested in modern
methods of law enforcement, including surveillance,
communication, and coordination. Rather, fairly con-
strued the statement intimated both guilt and wonder-
ment at the ability of the police to apprehend the perpetra-
tors of the crime so quickly." *Id.* This, the court found,
distinguished the declarant's question from questions
that are "designed to elicit information and a response,
rather than assert the defendant's involvement in
criminal activity." *Id.* Accordingly, the declarant's
"intent to make an assertion was apparent and that
his question directed to police officers on the scene con-
stituted hearsay." *Id.*

In other words, *Summers* reaffirmed that "nothing is
an assertion" for purposes of Rule 801 "unless intended
to be one." Fed. R. Evid. 801(a) 1972 advisory commit-
tee's note. We do not think that Deloney's remark was
intended to be an assertion in this case. Rather, it was, in
the language of *Summers*, "designed to elicit information

and a response," 414 F.3d at 1300, about whether Cowart was in on the deal. Even under *Summers*, that sort of question is not hearsay. *See id.* Accordingly, the district court did not abuse its discretion by admitting the question at trial.

*D. Sentencing*

That brings us to Love's sentencing claims. There are three of them, and the first is easily addressed. Love committed his crime before August 3, 2010 and was not sentenced until after August 3, 2010. Thus, under our former circuit precedent, *see, e.g.*, *United States. v. Fisher*, 635 F.3d 336, 338-40 (7th Cir. 2011), he did not benefit from the Fair Sentencing Act of 2010, 124 Stat. 2372. Since then, the United States Supreme Court has held that the Fair Sentencing Act applies to people who committed crimes before August 3, 2010 and were sentenced after August 3, 2010. *See Dorsey v. United States*, 132 S. Ct. 2321, 2331 (2012). Thus, as the government rightly concedes, Love is entitled to resentencing under the Fair Sentencing Act.

Love's second claim is that the district court incorrectly calculated the guidelines sentence for his drug conviction. Having reviewed the record, we think that Love is right. Calculating a sentence under the Guidelines begins with establishing the base offense level. *See United States v. Hill*, 683 F.3d 867, 869 (7th Cir. 2012). In drug cases, the base offense level is determined by the amount of drugs involved in the transaction. *See*

U.S.S.G. § 2D1.1(a)(5). The application notes to U.S.S.G. § 2D1.1 provide guidance on how to calculate these amounts. In reverse sting operations like the one at issue here, the base amount generally includes "the agreed-upon quantity of the controlled substance." *Id.* at cmt. n.5.[3] So, for instance, if the defendant agreed to buy fifty grams of drugs from a government informant, then his base amount would be fifty grams. "If, however, the defendant establishes that the defendant did not intend to provide or purchase, or was not reasonably capable of providing or purchasing, the agreed-upon quantity of the controlled substance," then "the court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes that the defendant did not intend to provide or purchase or was not reasonably capable of providing or purchasing." *Id*. In other words, the agreed-upon quantities must be the result of "true negotiation and not idle talk." *United States v. Corral*, 324 F.3d 866, 871 (7th Cir. 2003).

Here, Love offered to sell Cowart 1.5 ounces of crack cocaine on September 14, 2009, and the probation officer included those 1.5 ounces into his drug quantity calculation. It is undisputed, however, that Love never actually intended to sell drugs that day—he wanted to

---

[3] At the time Love was sentenced, the relevant language was contained in application note 12 to U.S.S.G. § 2D1.1. The relevant language has since been moved to application note 5 of U.S.S.G. § 2D1.1. Its content remains the same.

rob and beat Cowart to avenge the robbery of his crack house. As a result, Love claims that the district court should have excluded the fictional 1.5 ounces from his drug quantity calculation. That, in turn, would have reduced his total drug quantity from 50.355 grams to 7.83 grams and his base level from twenty-six to eighteen.

Normally we review a district court's drug quantity calculation for clear error. *United States v. Cox*, 536 F.3d 723, 728 (7th Cir. 2008). Here, however, Love did not raise his claim in the district court, so our review is for plain error. *See United States v. Martin*, 692 F.3d 760, 766 (7th Cir. 2012). That is usually a high bar to clear, *see United States v. Bell*, 624 F.3d 803, 815 (7th Cir. 2010), but "[w]e have repeatedly held that a sentencing based on an incorrect Guidelines range constitutes plain error and warrants a remand for resentencing, unless we have reason to believe that the error in no way affected the district court's selection of a particular sentence," *Martin*, 692 F.3d at 766 (internal brackets and quotation marks omitted).

We think that such a plain error occurred here. The Guidelines provide that a drug quantity should not be included in a sentencing calculation if "the defendant did not intend to provide or purchase . . . the agreed-upon quantity of the controlled substance." U.S.S.G. § 2D1.1 cmt. n.5. Here, it is undisputed that Love never actually intended to provide 1.5 ounces of drugs to Cowart on September 14. Accordingly, those 1.5 ounces should not have been included in his sen-

tencing calculation. *See United States v. Davis*, 478 F.3d 266, 272 (5th Cir. 2007) (vacating sentence where defendant "intended to 'rip off' the confidential informant by selling him 3 ounces of a non-controlled substance in place of crack cocaine" because this "undisputed finding of fact establishes as a matter of law that [defendant] did not intend to provide the agreed amount of crack cocaine") (internal quotation marks omitted).

The government responds that Love robbed and beat Cowart to avenge the robbery of Love's crack house. "The fact that Love wanted to recover $1,450," the government reasons, "supports an inference that he had at least that much value taken from the crack house when it was robbed and that he intended to place the stolen money from Cowart back into the drug business." (Appellee's Br. at 30.) But drug quantity findings "must ultimately be based on *reliable* information"; "unsupported conjecture" is not enough. *United States v. Henderson*, 58 F.3d 1145, 1152 (7th Cir. 1995). Here, we know that whoever robbed the crack house apparently stole both cocaine and money. (Trial Tr. at 243.) But nothing in the record suggests how much cocaine was taken—much less that it was at least $1,450 worth, as the government would have us infer. Nor is there any evidence that Love intended to reinvest the stolen money back into his drug business; the government's "inference" in that regard is nothing more than speculation. We do not think that such speculation justifies increasing Love's sentence.

Recognizing that this case will be remanded for resentencing under the Fair Sentencing Act, the government offered at oral argument to address these factual gaps on remand. But we do not think that reexamining the issue on remand would do any good. As discussed, the Sentencing Guidelines clearly provide that drug amounts should not be included if "the defendant did not intend to provide or purchase . . . the agreed-upon quantity of the controlled substance." U.S.S.G. § 2D1.1 cmt. n.5. It is undisputed that Love never actually intended to provide 1.5 ounces of drugs to Cowart on September 14. Whatever evidence the government came up with on remand, it would not overcome this undisputed fact.[4]

Finally, Love argues that the district court improperly imposed a two-level sentencing enhancement for being an organizer, leader, manager, or supervisor of the conspiracy. *See* U.S.S.G. § 3B1.1(c). We review the district court's interpretation and application of the Guidelines *de novo* and its factual determination of Love's role in the offense for clear error. *See United States v. Robertson*, 662 F.3d 871, 876 (7th Cir. 2011). "[W]e will reverse only if our review of all the evidence leaves us with the

---

[4] Nor could the government seek to increase the drug quantity finding by introducing evidence of drug transactions other than the ones on September 9 and September 14. If the government fails to argue a basis for a sentencing enhancement in the first instance, it waives it and cannot raise that basis for the first time on remand. *See United States v. Tello*, 687 F.3d 785, 798-800 (7th Cir. 2012).

definite and firm conviction that a mistake has been made." *Id.* We have no such conviction here. As the district judge stated, "evidence at trial established that Love was the leader of the operation. Deloney sold the drugs to Cowart at Love's direction, and Acklin and Deloney beat Cowart to protect Love's drug business at his direction." (Sentencing Tr. at 121.) As we have already discussed, that evidence was enough to support a jury verdict. We think it was enough to support a sentencing enhancement, as well.

### III. CONCLUSION

We AFFIRM Love's conviction, VACATE Love's sentence, and REMAND for resentencing consistent with this opinion.