Filed 7/30/25  P. v. Smith CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RHODNEY DEAN SMITH,<br><br>    Defendant and Appellant. | G063244<br><br>(Super. Ct. No. RIF2002061)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside County, Charles J. Koosed, Judge. Affirmed.

Jean Matulis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Alan M. Amman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Rhodney Dean Smith was convicted of sexually abusing his step-granddaughter A.P. On appeal, he contends the trial court erred by admitting two categories of evidence: 1) statements A.P. made to her mother and cousin concerning the abuse, and 2) expert testimony on child sexual abuse accommodation syndrome (CSAAS). Smith also contends the court misinstructed the jury regarding this evidence and on one other issue. We affirm.[1]

STATEMENT OF FACTS

A.P. was 14 years old at the time this case was tried in 2023. She testified she met Smith around 2015, after he married her grandmother S.S., and at first, she and Smith got along okay. But starting in 2016, when A.P. was six years old, Smith began sexually abusing her on a regular basis. The abuse occurred at Smith's house in Menifee, where he and S.S. would often babysit A.P. and her cousin, S.R. However, A.P. testified she and Smith were alone in the house the first time he abused her.

On that occasion, Smith had A.P. come into his bedroom and locked the door behind her. Then he told her to take down her pants and underwear and lay on the bed. After A.P. complied, Smith told her he was going to tickle her and proceeded to lick the outside of her vagina.

According to A.P., the licking lasted a couple of seconds before Smith stopped and told her to get dressed. But before she left the room, he

_____

[1] The Attorney General correctly notes Smith did not object in the trial court to some of the evidence and instructions he challenges on appeal, which raises the prospect of forfeiture. However, we will consider all of Smith's arguments on the merits because he contends his attorney was ineffective for failing to object below and the court's alleged errors violated his fair trial rights. (See Pen. Code, § 1259; *People v. Butler* (2003) 31 Cal.4th 1119, 1128; *People v. Smithey* (1999) 20 Cal.4th 936, 976–977, fn. 7.)

told her not to tell anyone about the incident because it was their "little secret." Therefore, she did not immediately disclose what he had done to her. In fact, she did not even realize it was wrong—she simply thought the licking was Smith's "silly" way of tickling her.

A.P. testified Smith molested her in a similar fashion about twice a month over the course of the next year or so. She could not remember every incident, but she did have a vivid memory of the first and last times Smith licked her vagina in the bedroom. Following the final incident, he told her he was not going to do that to her anymore because she was getting older. At that time, A.P. was seven or eight years old and still did not understand the import of Smith's conduct.

But that changed a few years later in 2019, when A.P. was 10 years old. At that time, A.P.'s mother, I.P., told A.P. about a coworker whose daughter had been touched in her "private areas" and raped by her babysitter. I.P. also told A.P. sexual molestation is wrong, and if anyone had ever molested her, she needed to tell her about it. That made A.P. realize what Smith had done to her under the guise of tickling was "messed up and wrong." She wanted to tell I.P. about it at that very moment, but she did not do so for fear I.P. would not believe her.

A short time later, A.P. broached the subject with her cousin S.R. Although she wanted to come right out and disclose what Smith had done to her, A.P. got scared S.R. might not believe her. Therefore, A.P. instead asked S.R. if anyone had ever touched her inappropriately or if she had ever noticed anything weird about Smith. Those questions led S.R. to believe A.P. had been victimized so, in a panic, she immediately began peppering A.P. with questions about who had molested her and how. But at that point, A.P. got

nervous and changed the subject. She never did tell S.R. whether she had been sexually abused.

A month or two later, I.P. again talked to A.P. about her coworker's daughter who had been sexually abused by her babysitter. I.P. also assured A.P. she would believe her if she ever told her she had been molested. When A.P. heard that, she burst into tears and told I.P. Smith had done something to her. At the prosecutor's direction, though, neither A.P. nor I.P. revealed the details of that disclosure in their testimony.

As part of its case-in-chief, the prosecution called Dr. Veronica Thomas to testify about CSAAS. As explained more fully below, Dr. Thomas testified CSAAS is useful for understanding the common characteristics of child sexual abuse. She cautioned, however, that CSAAS is not a diagnostic tool for determining whether such abuse has occurred in a particular case. Thus, she was unable to offer an opinion as to whether the charges against Smith were true or not. In fact, Dr. Thomas testified she was unaware of the facts in this case and had never met either Smith or A.P.

On behalf of the defense, Smith's wife, S.S., testified that, although she was not with Smith every moment they babysat A.P., she never saw Smith take A.P. into the bedroom and she did not believe he had ever molested A.P. In addition, Dr. Ashley Cabadas, a forensic evaluator, testified that based on her assessment of Smith, she did not believe he had a pedophilic disorder.

In closing argument, defense counsel contended A.P. was not a credible witness and she had never actually been sexually abused. Rather, she falsely implicated Smith because I.P. kept bringing up the issue of molestation and reminding her about her coworker's daughter being sexually abused. The jury, however, convicted Smith as charged of two counts of oral

4

copulation with a child aged 10 or younger. (Pen. Code, § 288.7, subd. (b).)
The trial court sentenced him to 30 years to life in prison for those crimes.

DISCUSSION

I.

A.P.'S EXTRAJUDICIAL STATEMENTS

Smith contends the trial court violated the hearsay rule and his
due process rights by admitting the out-of-court statements A.P. made to S.R.
and I.P. about being abused and by allowing the jury to consider those
statements for their substantive truth. We disagree.

*A. Background*

Before trial, Smith moved to exclude A.P.'s statements on the
basis they constituted hearsay and did not meet the requirements for
admission under the so-called "'fresh complaint'" doctrine. Alternatively,
Smith argued if the statements were admissible, the trial court should give a
limiting instruction that informed the jury: 1) the statements were
admissible only to rebut an allegation that A.P. failed to make a complaint
about Smith; and 2) the statements were not admissible for their substantive
truth to prove the events complained of actually occurred.

The trial court ruled the statements were admissible as to A.P.'s
credibility under the fresh complaint doctrine. It also agreed to give a
limiting instruction along the lines proposed by Smith. In addition, the
prosecutor assured the court he would not elicit any details about what A.P.
told I.P. about being sexually abused by Smith.

At trial, the prosecutor did not elicit any details about A.P.'s
disclosure to I.P. But when it came time to instruct the jury, the trial court
did not give a limiting instruction regarding A.P.'s statements or any other
evidence in the case. It did, however, give CALCRIM No. 318, the standard

5

jury instruction on prior statements. Whereas A.P. sought an instruction that would have prohibited the jurors from considering A.P.'s statements for their substantive truth, the court told the jurors, "If you decide that [a] witness made [a] statement [before trial], you may use that statement in two ways: one, to evaluate whether the witness's testimony in court is believable, and two, as evidence that the information in that earlier statement is true." (CALCRIM No. 318.)

In closing argument, the prosecutor argued A.P.'s disclosure of abuse to I.P., and her attempted disclosure to S.R., bolstered the credibility of her allegations of sexual abuse against Smith. Defense counsel did not object to that argument, nor did she object to CALCRIM No. 318 or voice any concerns about the court not giving a limiting instruction on the use of A.P.'s statements.

## B. Applicable Hearsay Principles

Hearsay evidence is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Such evidence generally is inadmissible at trial. (*Id.*, subd. (b).) However, this prohibition does not apply to out-of-court statements when they are offered for a nonhearsay purpose, i.e., for something other than the truth of the matter stated. (*People v. Davis* (2005) 36 Cal.4th 510, 535–536.)

In sex crimes cases, extrajudicial statements of the victim may be admitted for a nonhearsay purpose pursuant to the fresh complaint doctrine. Under that doctrine, "proof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others—

6

whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*People v. Brown* (1994) 8 Cal.4th 746, 749–750 (*Brown*).)

Because fresh complaint evidence is admitted for a nonhearsay purpose, it may not be considered for the truth of the matter asserted. (*Brown, supra*, 8 Cal.4th at pp. 755, 763.) It may, however, be used to corroborate the victim's testimony or rebut any inferences that might be drawn from the failure to complain. (*Id.* at pp. 750, 759–761, 763–764; *People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1522.) And although the details of the offense disclosed in the complaint may not be revealed to the jury, information regarding the nature of the offense and the identity of the alleged offender may be admitted. (*People v. Burton* (1961) 55 Cal.2d 328, 351, abrogated on another point in *Brown, supra*, at pp. 756–757, 763.)

Furthermore, the admissibility of a fresh complaint does not turn "upon whether the victim's complaint was made immediately following the alleged assault or was preceded by some delay, nor upon whether the complaint was volunteered spontaneously by the victim or instead was prompted by some inquiry or questioning from another person. Rather, these factors simply are to be considered among the circumstances of the victim's report or disclosure that are relevant in assisting the trier of fact in assessing the significance of the victim's statements in conjunction with all of the other evidence presented." (*Brown, supra*, 8 Cal.4th at p. 763.)

7

*C. Standard of Review*

Rulings on the admissibility of evidence are reviewed under the deferential abuse-of-discretion standard. (*People v. Thompson* (2010) 49 Cal.4th 79, 128.) Under that standard, we will not disturb the trial court's ruling unless it acted "in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

*D. Analysis*

1.  The Admissibility of A.P.'s Statements

In challenging the admission of A.P.'s statements to S.R. and I.P., Smith concedes "the bare fact and circumstance of the statements may have been admissible" under the fresh complaint doctrine. But he asserts A.P.'s "adoption of specific descriptions of behavior" that were mentioned in her conversations with S.R. and I.P. constituted inadmissible hearsay. In other words, Smith argues that, when viewed in context, A.P.'s statements to S.R. and I.P. exceeded the scope of the fresh complaint doctrine because they implied specific details about the alleged abuse. In that regard, Smith complains, "A.P.'s statements not only named [him] specifically, but were contextual statements that she had been inappropriately touched in her private area."

The Attorney General disagrees. He argues that, irrespective of the fresh complaint doctrine, A.P.'s statements to S.R. were admissible because they "were not hearsay at all." In so arguing, the Attorney General correctly points out that A.P. did not tell S.R. that she (A.P.) had been molested; rather A.P. asked S.R. if S.R. had been molested, or if she had ever noticed anything weird about Smith. According to the Attorney General,

8

"There was no 'matter asserted' in [those] question[s] and even if there was one, it was not offered at trial to prove it. It was not hearsay."

In support of that argument, the Attorney General relies on cases where a declarant's statement in the form of a request was deemed nonhearsay because "a request, by itself, does not assert the truth of any fact." (*People v Jurado* (2006) 38 Cal.4th 72, 117.) But A.P. did not make a *request* to S.R. Rather, she *asked* S.R. if anyone had ever touched her inappropriately or if she had ever noticed anything weird about Smith. And although A.P. phrased her remarks in the form of questions, her apparent intention was to inform S.R. that she had been molested, and that is how S.R. interpreted them, which is why S.R. panicked and began asking A.P. about that issue. Because A.P.'s questions impliedly asserted a factual matter, they satisfy the basic definition of a hearsay statement. (*People v. Garcia* (2008) 168 Cal.App.4th 261, 289; *People v. Morgan* (2005) 125 Cal.App.4th 935, 943; accord, *U.S. v. Summers* (10th Cir. 2005) 414 F.3d 1287, 1299–1300 [a declarant's questions will be deemed hearsay if they were intended to assert a factual matter].) We thus reject the state's claim to the contrary.

That brings us back to the fresh complaint doctrine. Although A.P.'s statements to S.R. and I.P. did not expressly include any specific details, Smith fears the jury may have construed them as an accusation by A.P. that Smith had touched her inappropriately because that issue was part of the broader context in which A.P. made her statements to S.R. and I.P. In challenging A.P.'s statements, Smith also notes her statement to I.P. about Smith having done something to her was made in response to I.P.'s remarks about the alleged sexual abuse of her coworker's daughter and I.P.'s statement that she would believe A.P. if she ever said she had been molested.

9

But, as we noted above, the fact some of A.P.'s statements were not spontaneous goes to their weight, not their admissibility. (*Brown, supra*, 8 Cal.4th at p. 763.) And even if A.P.'s statements had impliedly revealed some information about how Smith allegedly molested her, that would not necessarily preclude their admission. In fact, our Supreme Court has made it clear that the fresh complaint doctrine is not limited to "the bare 'fact of complaint'" without any reference to "the nature of the offense." (*People v. Burton, supra*, 55 Cal.2d at p. 351.) To the contrary, because "testimony to the bare fact that the victim 'made a complaint' as to an unspecified subject matter on its face would be meaningless," some level of specification and detail is required to make the complaint relevant to the charged offenses. (*Id.* at pp. 351–352.)

Here, the evidence regarding A.P.'s disclosure to I.P. and her attempted disclosure to S.R. did not include any details about the abuse that Smith had allegedly subjected her to. Rather, the evidence simply suggested in broad terms that Smith had touched A.P. in an inappropriate or lewd manner. Accordingly, it did not exceed the level of detail permitted under the fresh complaint doctrine, and the trial court did not abuse its discretion in allowing the jury to consider it. (See *People v. Burton, supra*, 55 Cal.2d at pp. 337–338, 352 [evidence the victim had reported the defendant made her fondle his penis was properly admitted under the fresh complaint doctrine].)

2.  Lack of a Limiting Instruction

Alternatively, Smith contends the trial court prejudicially erred by failing to give a limiting instruction regarding A.P.'s extrajudicial statements and by instead instructing the jurors pursuant to CALCRIM No. 318 that they could consider those statements for their substantive truth. It is true that, when requested, "the trial court must instruct the jury as to the

10

limited purpose for which the fresh complaint evidence was admitted." (*People v. Manning* (2008) 165 Cal.App.4th 870, 880; *People v. Ramirez, supra,* 143 Cal.App.4th at p. 1522.) Contrary to Smith's arguments, however, the lack of a limiting instruction did not undermine the fairness of his trial so as to trigger the harmless-beyond-a-reasonable-doubt standard of review that applies to federal constitutional error. (See *Chapman v. California* (1967) 386 U.S. 18, 24.) Instead, it amounts to state evidentiary error, which is not grounds for reversal unless it is reasonably probable the defendant would have obtained a more favorable result had a proper limiting instruction been given. (*People v. Benavides* (2005) 35 Cal.4th 69, 91; *People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Manning, supra,* 165 Cal.App.4th at p. 880; *People v. Ramirez, supra,* 143 Cal.App.4th at p. 1526.)

No such probability exists in this case. The lack of a limiting instruction on the permissible use of the fresh complaint evidence related solely to the extrajudicial statements that A.P. made to S.R. and I.P. Irrespective of how the jury construed those out-of-court statements, it still had the opportunity to hear from A.P. on the witness stand. Given that the jury had the chance to judge A.P.'s credibility in-person, and considering her extrajudicial statements were consistent with her trial testimony, it is unlikely their admission altered the outcome of the trial. (*People v. Manning, supra,* 165 Cal.App.4th at p. 881; *People v. Ramirez, supra,* 143 Cal.App.4th at p. 1526.) Therefore, any error in failing give a limiting instruction was harmless. (*Ibid.*) No cause for reversal has been shown.

11

## II.

Smith mounts a similar attack on the CSAAS evidence, claiming the trial court erred by both admitting the evidence and in instructing the jury on its permissible use. Neither contention is persuasive.

*A. Background*

As noted above, the CSAAS evidence in this case was presented through Dr. Veronica Thomas, who has been practicing clinical and forensic psychology for nearly four decades. At trial, she testified the conceptual framework for CSAAS grew out of a study that Dr. Roland Summit conducted in the 1980's involving female incest victims. Based on the results of that study, Dr. Summit published an article to help people understand the dynamics of sexually abusive relationships and to dispel some of the myths associated with child sexual abuse, including the widely held belief that the perpetrators of such abuse are usually a stranger to the victim.

Dr. Thomas testified Dr. Summit's article also identified five characteristics commonly associated with child sexual abuse: secrecy, helplessness, accommodation, delayed or attempted disclosure, and recantation. Although those characteristics were intended to be descriptive, not diagnostic, Dr. Thomas said they had often been used forensically to determine whether child sexual abused had occurred in particular cases. As Dr. Thomas explained, however, that was not Dr. Summit's intent. In fact, he came to regret using the word "syndrome" in the term CSAAS, to the extent it implied CSAAS could be used for diagnostic purposes. And to clear up any misunderstanding about that issue, he published a follow-up article explaining that CSAAS is merely a framework for understanding the

12

dynamics of child sexual abuse and should not be used as a checklist for determining the likelihood of abuse in a particular case.

With that understanding in mind, Dr. Thomas discussed the characteristics of CSAAS in general terms during her testimony. She did not attempt to apply those characteristics to the facts of this case, even though there was evidentiary support for some of them, e.g., delayed disclosure. Dr. Thomas also made clear in her testimony that she knew nothing about this case or whether the charges against Smith were true. And she admitted that, although Dr. Summit's original study was based on the assumption the children he interviewed were telling the truth, the reality is, children are susceptible of being manipulated by others and are fully capable of making false allegations of sexual abuse.

With regard to this testimony, the trial court instructed the jurors, "You have heard testimony from Dr. Veronica Thomas regarding [CSAAS]. Dr. Veronica Thomas' testimony about [CSAAS] is not evidence that the defendant [committed] any of the crimes charged against him. You may consider this evidence only in deciding whether or not . . . A.P.'s conduct was not inconsistent with the conduct of someone who has been molested and evaluating the believability of [her] testimony." (CALCRIM No. 1193.)

## B. *The Admissibility of Dr. Thomas's Testimony*

Smith argues Dr. Thomas's testimony should have been excluded because the original basis for admitting CSAAS evidence has been debunked, and the jury was likely to misconstrue her testimony as proof A.P. had been molested. Smith contends that likelihood rendered his trial unfair. We find no error in the admission of Dr. Thomas's testimony.

Despite numerous and repeated attacks on its reliability, CSAAS evidence has been widely accepted in courts throughout the United States.

13

(*People v. Munch* (2020) 52 Cal.App.5th 464, 468–472 (*Munch*).) A few state courts have limited or questioned its admissibility (see, e.g., *State v. J.L.G.* (N.J. 2018) 190 A.3d 442, 463 [CSAAS testimony may be admitted only to explain the child's delayed disclosure of abuse]; *Sanderson v. Com.* (Ky. 2009) 291 S.W.3d 610 [split opinion barring CSAAS evidence over concerns about its reliability, scientific acceptance and potential to dominate the decision-making process]). But the "vast majority" of jurisdictions have approved the use of CSAAS evidence in criminal trials. (*Munch, supra,* at p. 472.)

That includes California. In *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*), the California Supreme Court recognized expert testimony on CSAAS has been found to be "admissible to rehabilitate [a child's] credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*Id.* at p. 1300.) Although *McAlpin* dealt with a slightly different issue regarding the use of expert testimony to explain why a *parent* might not immediately report the sexual abuse of his or her child, it recognized CSAAS evidence has a place in child sexual abuse trials. Such evidence may not be admitted to prove the defendant committed the alleged acts of abuse (*ibid.*; *People v. Clotfelter* (2021) 65 Cal.App.5th 30, 64), but it can be used to educate jurors about the dynamics of child sexual abuse and "'to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" (*McAlpin, supra,* at p. 1301.)

As this court explained in *People v. Lapenias* (2021) 67 Cal.App.5th 162 (*Lapenias*), CSAAS evidence also is admissible to evaluate the credibility of an alleged victim of child sexual abuse. (*Id.* at p. 171.) In rejecting a claim that such evidence is not sufficiently reliable to pass muster under the test governing the admissibility of new scientific methods (see

14

*People v. Kelly* (1976) 17 Cal.3d 24) we explained CSAAS testimony does not describe a "new" scientific method, nor does it "purport to provide a definitive truth; rather, . . . expert testimony [on CSAAS simply] attempts to disabuse jurors of misconceptions they might hold about the conduct of children who have been sexually abused." (*Lapenias, supra*, at p. 173.)

Smith argues the original basis for admitting CSAAS evidence has been debunked, warranting a reexamination of its probative value in criminal trials. In so arguing, Smith points out that even Dr. Summit had concerns about how courts were using his CSAAS theory, which is why he wrote a follow-up paper to his original article on the topic. Smith argues that follow-up paper is proof CSAAS evidence is susceptible of being misused by jurors as a diagnostic tool, rather than a descriptive one.

But that was not likely to happen in this case because Dr. Thomas thoroughly explained the evolution of Dr. Summit's work in her testimony. She made it abundantly clear to the jury that Dr. Summit was dismayed his original work on CSAAS had been used as a diagnostic tool for detecting child sex abuse, when it was actually intended as a framework for understanding the dynamics involved in child sexual abuse relationships. That is why Dr. Thomas refrained from offering any opinions about the truth of the allegations against Smith in this case. She knew—and more important, *she let the jury know*—that CSAAS is not designed for that purpose. Thus, there was no danger of the jury misconstruing her testimony in that regard.

For all these reasons, we conclude the trial court did not abuse its discretion or violate Smith's due process rights by allowing Dr. Thomas to testify about CSAAS. In finding her testimony was properly admitted, we join a plethora of courts that have upheld the admission of similar testimony in other cases. (See, e.g., *People v. Flores* (2024) 101 Cal.App.5th 438, 455–459;

15

*People v. Sedano* (2023) 88 Cal.App.5th 474, 477–483; *Lapenias,* 67 Cal.App.5th at pp. 170–175; *Munch, supra*, 52 Cal.App.5th at p. 466; *People v. Julian* (2019) 34 Cal.App.5th 878, 885; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503; *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069; *People v. Perez* (2010) 182 Cal.App.4th 231, 245; *People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001–1002; *In re S.C.* (2006) 138 Cal.App.4th 396, 418; *People v. Wells* (2004) 118 Cal.App.4th 179, 188; *People v. Yovanov* (1999) 69 Cal.App.4th 392, 406–407; *People v. Housley* (1992) 6 Cal.App.4th 947, 955–956; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449–450; *People v. Stark* (1989) 213 Cal.App.3d 107, 116–117.)

C.  *The Jury Instruction on CSAAS*

Smith also takes aim at CALCRIM No. 1193, the jury instruction given with respect to Dr. Thomas's expert testimony on CSAAS. In Smith's view, the instruction was legally flawed and violated his fair trial rights because it allowed the jury to use Dr. Thomas's testimony as substantive evidence of his guilt. However, it is not reasonably likely the jury construed the instruction in that manner.

As set forth above, the jury was instructed pursuant to CALCRIM No. 1193 that Dr. Thomas's testimony about CSAAS "*is not evidence that the defendant [committed] any of the crimes charged against him.* You may consider this evidence only in deciding whether or not . . . A.P.'s conduct was not inconsistent with the conduct of someone who has been molested and evaluating the believability of [her] testimony." (Italics added.)

Although jurors are presumed to understand and follow the instructions they are given (*People v. Yeoman* (2003) 31 Cal.4th 93, 139), Smith suggests the jurors ignored the italicized text because of what followed

16

it. Indeed, he asserts that allowing the jury to consider Dr. Thomas's testimony to evaluate A.P.'s credibility and determine whether her conduct was not inconsistent with that of someone who has been molested was tantamount to allowing the jury to consider Dr. Thomas's testimony as proof that Smith was guilty of the charged offenses.

However, CALCRIM No. 1193 could not have been more clear in apprising the jury that CSAAS evidence cannot be used as proof the defendant committed the alleged offenses—a point Dr. Thomas repeatedly emphasized in her testimony—and there is nothing in the record to suggest the jury ignored that admonishment or had any difficulty applying CALCRIM No. 1193 to the evidence in this case.

Moreover, Smith's argument overlooks the primary reason CSAAS evidence is admissible in criminal trials: "The purpose of CSAAS is to understand a child's reactions when they have been abused. [¶] A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the child's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the expert's] testimony to conclude [the child] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the child's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction." (*People v. Gonzales, supra,* 16 Cal.App.5th at p. 504; accord, *Lapenias, supra*, 67 Cal.App.5th at p. 176 [CALCRIM No. 1193 "accurately instructs the jury on . . . the proper use—

17

and the proper limitations on the use—of CSAAS evidence"]; *Munch, supra,* 52 Cal.App.5th at p. 474.)

Smith is correct that the trial court's instruction on CSAAS omitted some language that was added to CALCRIM No. 1193 shortly before his trial began in 2023, namely that, "Child sexual abuse accommodation syndrome relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse." (CALCRIM No. 1193 (2024 ed.) p. 956.)

Smith does not, however, explain how that omitted language would have helped his cause at trial. The fact is, Dr. Thomas explained both of those points in her testimony, and based on everything she said, the jury would have understood the limited purpose for which her testimony was offered. As given, CALCRIM No. 1193 also provided guidance on this issue by informing the jury Dr. Thomas's testimony was not being offered as substantive evidence of Smith's guilt, and it could only consider her testimony to evaluate A.P.'s credibility and determine whether her conduct was not inconsistent with that of someone who has been molested.

As we have explained above, that is exactly how the courts have permitted CSAAS evidence to be used in cases involving alleged child sexual abuse. It is not reasonably likely the jury used Dr. Thomas's testimony for an improper purpose or that the trial court's instructions violated Smith's fair trial rights in any respect. (See *People v. Ramirez* (2023) 98 Cal.App.5th 175, 219–220; *People v. Ortiz* (2023) 96 Cal.App.5th 768, 782, 816; *Lapenias, supra,* 67 Cal.App.5th at pp. 175–176; *Munch, supra,* 52 Cal.App.5th at p. 474; *People v. Gonzales, supra,* 16 Cal.App.5th at p. 504.)

18

INSTRUCTIONS PERMITTING THE JURY TO CONVICT BASED
ON THE TESTIMONY OF A SINGLE WITNESS

Pursuant to CALCRIM No. 1190, the jury was instructed, "Conviction of a sexual assault crime may be based on the testimony of a complaining witness alone." The jury was also told, per CALCRIM No. 301, "The testimony of only one witness can prove any fact. Before you can conclude that the testimony of one witness proves a fact, you should be careful to review all of the evidence." Smith contends these instructions bolstered A.P.'s testimony above that of other witnesses, which lowered the prosecution's burden of proof in violation of his due process rights. Again, we disagree.

In *People v. Gammage* (1992) 2 Cal.4th 693 (*Gammage*), the California Supreme Court upheld jury instructions substantively indistinguishable from the instructions given in this case. In fact, the two instructions given in *Gammage* were the CALJIC predecessors of the two instructions given here. The first of those instructions, CALJIC No. 10.21, provided, "'It is not essential to a conviction of a charge of rape that the testimony of the witness with whom sexual intercourse is alleged to have been committed be corroborated by other evidence.'" (*Gammage, supra,* at pp. 696–697.)

And the second of those instructions, CALJIC No. 2.27, provided, "'Testimony as to any particular fact which you believe given by one witness is sufficient for the proof of that fact. However, before finding any fact required to be established by the prosecution to be proved solely by the testimony of such a single witness, you should carefully review all the

19

testimony upon which the proof of such fact depends.'" (*Gammage*, supra, 2 Cal.4th at p. 696, italics omitted.)

Akin to Smith here, the defendant in *Gammage* argued those instructions created a preferential credibility standard for the complaining witness that impermissibly diluted the prosecution's burden of proof. (*Gammage, supra*, 2 Cal.4th at p. 700.) But the Supreme Court disagreed, finding the instructions correctly stated the law in California that the "'conviction of a sex crime may be sustained upon the uncorroborated testimony of the prosecutrix.'" (*Id*. at p. 700.)

In so finding, the Supreme Court noted the no-corroboration rule was created to ease the historical imbalance between the victim and the accused in sex crimes cases. (*Gammage, supra*, 2 Cal.4th at p. 701.) And although the court recognized the imbalance is less prevalent now than in the past, it determined there was no harm in instructing the jury on the rule when the jury is also told the prosecution must prove the charges beyond a reasonable doubt. (*Ibid*.) In that situation, the court concluded, the instructions as a whole strike a balance that "'protects the rights of both the defendant and the complaining witness.'" (*Ibid*.)

Smith acknowledges his jury was repeatedly instructed the prosecution had the burden of proving the charges against him beyond a reasonable doubt. Yet, he maintains we should not follow *Gammage* for two reasons. First, the instructions in that case were more protective than the ones his jury received, and second, *Gammage* was wrongly decided. We see no meaningful distinction, however, between the instructions given in *Gammage* and the ones given here, in that they both instructed the jury not to rely solely on the victim's testimony to prove a fact or secure a conviction without carefully considering the evidence as a whole. Therefore, under the reasoning

of *Gammage*, the use of CALCRIM Nos. 1190 and 301 did not violate Smith's due process rights. (See *Nguyen v. Cates* (C.D.Cal., Feb. 7, 2023, No. CV 22-2039 DOC (AS)) 2023 WL 2248757 [rejecting due process challenge to those instructions]; *Kelly v. Lizarraga* (C.D.Cal., July 26, 2016, No. SA CV 15-263-GW (PJW)) 2016 WL 7840708 [same]; *Rose v. Foulk* (E.D.Cal., Sept. 17, 2014, No. 2:12-cv-03028-JKS) 2014 WL 4661134 [same].)

Moreover, even if we believed *Gammage* was wrongly decided, *which we do not*, we would not be at liberty to disregard it because, as a lower appellate court, we must follow decisions from the California Supreme Court under the doctrine of stare decisis. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) We thus uphold the trial court's instructions allowing the jury to convict based on the testimony of a single witness.

One final point. Throughout his brief, Smith contends that even if none of the jury instructions he assails on appeal were faulty or prejudicial in their own right, the combined effect of the instructions undermined his fair trial rights. (See generally *People v. Cunningham* (2001) 25 Cal.4th 926, 1009 ["'[a] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error'"].) But as we have explained, the jury in this case was properly instructed in all key respects. We do not believe the instructions—whether considered individually or in conjunction with each other—rendered Smith's trial unfair.

21

## DISPOSITION

The judgment is affirmed.


GOODING, J.

WE CONCUR:


MOORE, ACTING P. J.


SCOTT, J.